**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CONRAD ZAPIEN,
*Petitioner-Appellant*,

v.

RONALD DAVIS,[*]
*Respondent-Appellee.*

No. 09-99023

D.C. No.
2:94-cv-01455-
WDK

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
William D. Keller, Senior District Judge, Presiding

Argued and Submitted
December 11, 2014—San Francisco, California

Filed November 9, 2015
Amended December 16, 2016

Before: Alex Kozinski, Johnnie B. Rawlinson and Mary H.
Murguia, Circuit Judges.

Order;
Opinion by Judge Kozinski

---

[*] Ronald Davis is substituted for his predecessor Michael Martel as
Warden of San Quentin. *See* Fed. R. App. P. 43(c)(2).

## SUMMARY

### Habeas Corpus / Death Penalty

The panel filed an order amending an opinion filed November 9, 2015, and denying a petition for panel rehearing or rehearing en banc, in a case in which the panel affirmed the district court's denial of California state prisoner Conrad Zapien's habeas corpus petition challenging his first degree murder conviction and death sentence.

In the amended opinion, the panel:

•   rejected Zapien's argument that the California Supreme Court unreasonably rejected his claim that he was denied due process when a prosecution investigator, who found a sealed envelope containing an audio tape explaining defense strategy, destroyed the tape.

•   held that the California Supreme Court did not unreasonably reject Zapien's arguments that his rights under the Confrontation Clause were violated by (1) the trial court's admission of statements that Zapien's sister made at a preliminary hearing and (2) the introduction of multi-level hearsay testimony.

•   held that the California Supreme Court did not unreasonably reject Zapien's claims of ineffective assistance of counsel at the guilt phase.

This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

- held that the California Supreme Court did not unreasonably reject Zapien's claims of ineffective assistance of counsel at the sentencing phase.

- held that the California Supreme Court did not unreasonably reject Zapien's claim that his right to an impartial jury was violated when the trial court failed to dismiss a juror who admitted to hearing a news report that suggested Zapien would hurt his guards if he were given the death penalty.

**COUNSEL**

Tracy J. Dressner (argued), La Crescenta, California, Jay L. Lichtman (argued), Los Angeles, California for Appellant.

Joseph P. Lee (argued), Deputy Attorney General, Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Special Assistant Attorney General, A. Scott Hayward, Deputy Attorney General, Office of the Attorney General for the State of California, Los Angeles, California for Appellee.

## ORDER

The opinion filed November 9, 2015, and appearing at 805 F.3d 862, is **AMENDED** as reflected in the attached amended opinion. The petition for panel rehearing or rehearing en banc is **DENIED**. No additional petitions for rehearing are permitted.

## OPINION

KOZINSKI, Circuit Judge:

Conrad Zapien was convicted of first degree murder and sentenced to death by the state of California. He challenges both his conviction and sentence.

## BACKGROUND

In 1987, Zapien was found guilty of killing Ruby Gonzalez in her home by shooting her four times and stabbing her five times. Zapien was a heroin addict, desperate for money, and Ruby was the mistress of his sister's husband. The prosecution's case at trial was that Zapien intended to rob Ruby's home after being told by his sister that there was money and jewelry inside. The prosecution theorized that Ruby surprised and confronted Zapien, who killed her and fled town the next day. Zapien spent the months after Ruby's death living under pseudonyms in various Christian homes, before eventually being found and arrested in Arizona.

Before Zapien's trial began, prosecutor Gary Van Camp and his investigator Harry Heidt found a sealed envelope

bearing the name of Zapien's trial counsel. The envelope contained an audio tape explaining the defense's strengths and weaknesses. Heidt later claimed that Van Camp told him to listen to the tape, but he destroyed it instead. Heidt eventually revealed the incident and Zapien's counsel moved to have all charges dismissed. The trial court denied the motion, finding that Heidt had not listened to the tape.

The jury convicted Zapien of first degree murder and found a "special circumstance" which made Zapien death eligible—that the killing was committed during the course of a burglary and an attempted robbery. The jury sentenced Zapien to death.

Zapien appealed his conviction and sentence to the California Supreme Court, which denied his appeal in a lengthy reasoned opinion in 1993. *See People* v. *Zapien*, 846 P.2d 704 (Cal. 1993) (in bank). In 1996, Zapien filed a federal habeas petition that was stayed pending exhaustion of state remedies. Zapien then filed a state habeas petition in the California Supreme Court. In 1998, the California Supreme Court denied all but four of Zapien's claims on timeliness grounds and, in the alternative, summarily denied all of his claims on the merits. Zapien then returned to federal court. Although he was granted an evidentiary hearing on some of his ineffective assistance of counsel claims, the district court ultimately denied them all.

## DISCUSSION

### 1.  The Tape

Zapien argues he was denied due process when Heidt destroyed the defense strategy tape. The California Supreme

Court concluded that, though Heidt "clearly acted wrongly in disposing of the envelope and its contents, . . . this improper act did not deprive [Zapien] of due process of law or otherwise deny [him] a fair trial" because there was no "'conscious effort to suppress exculpatory evidence.'" *Zapien*, 846 P.2d at 723 (quoting *California* v. *Trombetta*, 467 U.S. 479, 488 (1984)). Zapien argues that this was an unreasonable application of *Trombetta* and *Arizona* v. *Youngblood*, 488 U.S. 51 (1988).

However, both *Youngblood* and *Trombetta* dealt with the destruction of potentially exculpatory evidence—not, as here, the destruction of attorney-client work product. *See Youngblood*, 488 U.S. at 57–58; *Trombetta*, 467 U.S. at 486–87. Zapien asserts the novel theory that destroying the tape constituted the destruction of exculpatory evidence because, had the tape been recovered, it could have been tested. Such testing apparently would have revealed that the tape had been listened to and thus that misconduct had occurred. Revealing the alleged misconduct would have been "exculpatory," according to Zapien, because it would have required the case be dismissed.

Zapien's tortuous chain of reasoning is not supported, let alone "clearly established," by *Youngblood*, *Trombetta* or any other Supreme Court case. *See* 28 U.S.C. § 2254(d)(1) (a writ of habeas corpus may not be granted unless the state court reached a "decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"). Zapien provides no authority for the proposition that a due

process violation can be premised on the destruction of information already known to the defense.**[1]**

Zapien next argues that it was unreasonable for the California Supreme Court to adopt the Superior Court's factual finding that Heidt didn't listen to the tape. Because Zapien is unable to explain how listening to a defense strategy tape constitutes a due process violation, he likely wouldn't have a viable claim even if the state court's factual determination had been unreasonable. *See Wilson* v. *Corcoran*, 562 U.S. 1, 5–6 (2010) (holding that a state court's unreasonable factual determination is only relevant in a federal habeas proceeding to the extent it results in a decision that violates federal law). In any event, our review of a state appellate court's affirmance of a state trial court's credibility determination "is doubly deferential." *Briggs* v. *Grounds*, 682 F.3d 1165, 1170 (9th Cir. 2012). "[U]nless the state appellate court was objectively unreasonable in concluding that a trial court's credibility determination was supported by [the record], we must uphold it." *Id.* Here, even if "[r]easonable minds reviewing the record might disagree" as to the truthfulness of Heidt's testimony, "that does not suffice to supersede the trial court's credibility determination." *Rice* v. *Collins*, 546 U.S. 333, 341–42 (2006).

---

**[1]** Zapien's claim is more readily cognizable as a violation of his right to counsel under the Sixth Amendment, *see United States* v. *Danielson*, 325 F.3d 1054, 1070–71 (9th Cir. 2003), though, again, such a claim has not been clearly established by the Supreme Court. In any event, Zapien failed to bring this claim, either before us or in any prior state or federal proceeding.

## 2.  Confrontation Clause

Zapien next argues that his rights under the Confrontation Clause were violated when the trial court admitted various statements that his sister Inez—who refused to testify at trial—made at a preliminary hearing.[2]   Under the then-governing standards of *Ohio* v. *Roberts*, 448 U.S. 56 (1980), *abrogated by Crawford* v. *Washington*, 541 U.S. 36 (2004), the "adequate opportunity to cross-examine [a] witness" at a preliminary hearing typically provides "sufficient indicia of reliability" for statements from that hearing to be introduced at trial if the witness is unavailable.  *Id.* at 73 (alteration omitted) (internal quotation marks omitted).   Nonetheless, Zapien argues that the state court unreasonably applied *Roberts* because the government knew Inez had told lies during other parts of her preliminary hearing testimony (though not in the portions read to the jury).  Even assuming Inez had in fact lied, Zapien fails to show that the California Supreme Court's decision was an unreasonable application of *Roberts*.   Preliminary hearing testimony falls within the heartland of those statements deemed reliable under *Roberts*, *see* 448 U.S. at 73 (noting that "guarantees of trustworthiness" are found "in the accouterments of the preliminary hearing itself"), and Zapien can point to no case in which admitting preliminary hearing testimony has been

---

[2]  The trial court also allowed into evidence certain statements made by Inez during a police interview.  The California Supreme Court found that Zapien was procedurally barred from raising the argument that admission of these interrogation statements violated his confrontation rights, because he did not contemporaneously object to their admission at trial.  That dismissal on a procedural ground constitutes an independent and adequate basis for dismissing the claim, which we are barred from reviewing.  *See Coleman* v. *Thompson*, 501 U.S. 722, 750 (1991).

held to violate the Confrontation Clause solely because other testimony by the absent witness is untrue.

Zapien claims that his confrontation rights were also violated by the introduction at trial of multi-level hearsay testimony by Mariella Perez, a friend of Inez's daughter Juanita. Perez testified that Juanita told her that Inez's other daughter, "Little Inez," had told Juanita that Zapien arrived at Inez's house on the morning of the murder with blood on his shirt. An investigator also played a recording of Perez stating that Juanita told her that Little Inez saw Inez give Zapien her car keys. Both Juanita and Little Inez testified at trial: Little Inez denied seeing Zapien that day or talking to Juanita, and Juanita likewise denied the conversation. The California Supreme Court reasonably—indeed correctly—applied the holding in *California* v. *Green* that "the Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination." 399 U.S. 149, 158 (1970). Zapien argues here, as he did before the California Supreme Court, that *Green* is inapplicable in the context of multiple hearsay. But he cites no authority for that proposition, and the California Supreme Court reasonably rejected what it considered to be an "arbitrary rule based solely upon the number of levels of hearsay." *Zapien*, 846 P.2d at 717.

Zapien also argues that the admission of Perez's statements was such an egregious violation of California evidentiary law that it constituted a due process violation. It is not at all clear that there was a violation of California law, let alone one so fundamentally unfair that it amounted to a due process violation. In any event, we've held that, "[u]nder AEDPA, even clearly erroneous admissions of evidence that

render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by clearly established [Supreme Court precedent]." *Holley* v. *Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (internal quotation marks omitted). Because there is no Supreme Court case establishing the fundamental unfairness of admitting multiple hearsay testimony, *Holley* prohibits us from finding in Zapien's favor on this due process claim.

### 3. Ineffective Assistance of Counsel at the Guilt Phase

Zapien brings several ineffective assistance of counsel claims, all of which were summarily denied by the California Supreme Court.[3]  When confronted with a state court's summary denial, we "must determine what arguments or theories . . . could have supported . . . the state court's decision; and then . . . ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Harrington* v. *Richter*, 562 U.S. 86, 102 (2011). Our review of Zapien's ineffective assistance claims is doubly deferential:  "We take a highly deferential look at counsel's performance through the deferential lens of

---

[3]  Zapien's ineffective assistance claims were first presented to the state courts in a habeas petition over three years after the denial of Zapien's direct appeal.  In addition to summarily denying these claims on the merits, the California Supreme Court dismissed them on timeliness grounds. They should therefore be procedurally defaulted.  However, the state does not raise procedural default before us, nor did it do so before the district court.  Although we may raise the issue of procedural default sua sponte under exceptional circumstances, *see Day* v. *McDonough*, 547 U.S. 198, 209 (2006), we decline to do so here.

§ 2254(d)." *Cullen* v. *Pinholster*, 563 U.S. 170, 190 (2011) (internal quotation marks and citation omitted).

Zapien first argues that his trial counsel was ineffective for not vigorously impeaching the testimony of Ruby's daughter Marci. Thirteen-year-old Marci was an eyewitness to the murder and testified that during the attack she heard her mother say, "Chato, leave me alone. I will give you the money and the jewelry." "Chato" was Zapien's brother—who resembled Zapien—and was in prison at the time of the killing. Marci's testimony was harmful to Zapien both because it showed that he looked like the assailant and because it suggested he entered the home with an intent to commit a robbery, the "special circumstance" that made Zapien death eligible. Zapien argues that his trial counsel should have impeached Marci with statements she made during Zapien's preliminary hearing—and statements made to neighbors and the police—where she either failed to mention "the money and the jewelry" or implied that Ruby was offering the intruder "the money and the jewelry" rather than responding to a demand. Zapien also argues that trial counsel should have attempted to undermine Marci's account with testimony by a child memory expert, who would apparently have explained that, since Marci had just awoken from a violent dream, her memories of the attack may have been faulty.

However, a fairminded jurist could conclude that counsel made a strategic decision in how he approached Marci's impeachment. Even if counsel had tried to impeach Marci in the manner Zapien now suggests, a jury would likely still have found her testimony credible. Marci's physical description of the attacker wearing a plaid shirt and a vest was corroborated by the discovery of an abandoned plaid

shirt and vest covered in Ruby's blood.  Marci was by all accounts highly sympathetic on the stand.  And her memory of the event was vivid and prolonged—involving not merely witnessing the attack, but also hitting the assailant with a broom and trying to protect her sisters.  Aggressively attempting to impeach Marci's testimony may therefore have alienated the jury, without doing much to undermine her credibility.  Zapien's trial counsel took a different tack.  He stressed that Marci's testimony, even if true, failed to establish beyond a reasonable doubt that Zapien was the assailant.  Under the circumstances, we cannot conclude that all fairminded jurists would say such a strategy rendered counsel's assistance ineffective.  *See Harrington*, 562 U.S. at 102; *Strickland* v. *Washington*, 466 U.S. 668, 681, 688 (1984).

Zapien next claims that trial counsel should have introduced the testimony of Ruby's two other children, Joni and Jessica, who also witnessed the murder.  Joni told the police that the attacker was wearing a dark ski mask, and both Joni and Jessica said they heard a car speeding away after the attack.  Zapien claims that the ski mask testimony would have undermined Marci's account that Ruby thought the assailant was Chato, and the car sound would have undermined Mariella Perez's story that Zapien needed a car from Inez after the murder.

However, at the time of the murder, Joni and Jessica were eight and six respectively, much younger than the thirteen-year-old Marci.  Not only was Marci's story more precise and fleshed out than those of her sisters, it was also corroborated by the discovery of the plaid shirt and vest.  Because of their youth, Joni and Jessica may have been unpredictable on the stand, and putting them through the ordeal of testifying could

have alienated the jury. There was only a small, perhaps infinitesimal, possibility that a jury would have believed them rather than Marci. On balance, the risks associated with calling them to testify outweighed the potential benefits. Accordingly, it is reasonable to conclude that counsel wasn't ineffective in failing to call Joni and Jessica as witnesses.

Zapien next argues that counsel should have moved to exclude the testimony of Lena Chacon and Michael Jimenez, two witnesses Zapien met at a Christian home shortly after the murder. Chacon testified at trial that Zapien told her that he shot someone during the robbery of a store and was using a pseudonym because he was wanted for murder in California. Jimenez testified that Zapien had told him about two separate shootings—one in which he shot someone, who Jimenez thought was a woman, and another during the robbery of a store. Zapien argues that trial counsel was ineffective for failing to move in limine to exclude Chacon's and Jimenez's testimony as irrelevant to Ruby's murder. However, a review of the record reveals little basis upon which such a motion could plausibly have been successful. While both witnesses made vague and confusing statements during the preliminary hearing, their testimony clearly had the potential of being highly probative. Competent counsel could reasonably have concluded that moving to exclude their testimony on the grounds Zapien now suggests would have seemed frivolous.

Zapien also criticizes counsel for eliciting testimony from Chacon at trial regarding the apparent store-robbery killing. But, review of the cross-examination transcript reveals that counsel acted reasonably. Chacon mentioned on the stand that Zapien had admitted shooting someone, but didn't specify who the victim was. At that point, counsel made the

strategic decision to ask about the possibility of a second shooting in order to create doubt as to whether Zapien was referring to Ruby's killing. Under our doubly deferential review, we cannot say the California Supreme Court erred in concluding that counsel's representation was competent.

Zapien also claims that counsel was ineffective by failing to object to several instances of inadmissible and prejudicial hearsay testimony. Zapien claims counsel should have objected on Confrontation Clause grounds to Sergeant Stevens's testimony about what Inez told him. But counsel had cross-examined Inez at a preliminary hearing, and the California Supreme Court found that the same interest and motive existed in that cross-examination as at trial. The California Supreme Court's determination that this testimony didn't violate the Confrontation Clause wasn't unreasonable. *See Ohio* v. *Roberts*, 448 U.S. 56, 72–73 (1980), *abrogated by Crawford* v. *Washington*, 541 U.S. 36 (2004). The other hearsay statements Zapien complains about were cumulative of the evidence offered at trial and thus not prejudicial, even assuming that counsel should have objected to them.

Finally, Zapien argues that counsel was ineffective for failing to introduce evidence suggesting that Zapien had a broken hand at the time of the murder and was therefore likely incapable of killing Ruby. Zapien argued in his state habeas petition that trial counsel should have introduced testimony by Dr. James Day, a radiologist who allegedly treated Zapien for a hand injury twelve days before Ruby's murder. According to Zapien, Day's testimony would have shown that Zapien was injured, had a cumbersome cast placed on his right hand and was likely physically incapable of making the deep stab wounds found on Ruby's body. But even if counsel was in possession of medical records showing

that Zapien was treated for a fracture, a fairminded jurist could conclude that counsel's failure to pursue this line of defense did not amount to ineffective assistance. A fairminded jurist could also conclude that this single piece of medical evidence would not have created a reasonable likelihood of a different outcome at trial, given the other evidence of Zapien's guilt and, most significantly, the fact that the hand injury (as Zapien concedes) would not have made the attack impossible.

### 4. Ineffective Assistance of Counsel at the Sentencing Phase

Zapien argues that counsel was ineffective for failing to introduce various pieces of mitigating evidence at the sentencing phase. Zapien first claims that counsel should have introduced further evidence regarding his traumatic upbringing, which would have revealed that Zapien's father was a violent alcoholic who brutally beat Zapien's mother in front of the children and abandoned the family when Zapien was five. Zapien's father later returned and carried on a thirteen-year incestuous relationship with Zapien's sister that ended when Zapien's father shot her to death before killing himself.

Meanwhile, Zapien's mother worked as a prostitute and a "coyote" smuggling undocumented immigrants across the Mexican border. Two men with whom she was involved impregnated two of Zapien's sisters. Zapien's mother also carried a gun and drank at local bars, got men drunk and stole their wallets, and neglected her children, who grew up on the streets malnourished and hungry. She frequently beat Zapien and his siblings.

In addition, evidence in the habeas record indicates that Zapien's grandmother, with whom Zapien lived, also worked as a coyote. She routinely abused Zapien, whipping him with a rubber hose, often for acts committed by a sibling. She forced Zapien and his siblings to perform manual labor in the fields, and threw rocks at them when they took a break from working. On one occasion, she killed Zapien's pet rabbit and served it to him for dinner, which Zapien learned only after he had eaten the meal.

Zapien's uncle, who also lived in the grandmother's house, was a major drug dealer with multiple drug convictions; he used and sold heroin, and made drugs available to Zapien from a young age. Zapien was sentenced to juvenile hall for drug- and alcohol-related offenses when he was fifteen years old. He was a heroin addict by the age of twenty.

In addition to his drug addiction, Zapien had a history of blackouts and was diagnosed with syphilis. He had also been exposed to pesticides while working as a tree sprayer, and suffered numerous blows to the head at a young age.

Zapien contends that there is a reasonable probability that this sordid background evidence would have moved at least one juror to spare Zapien's life, and that it was unreasonable for the California Supreme Court to conclude otherwise, particularly given that Zapien's jury—without having heard this evidence—deliberated for three days before returning a death verdict.

The importance and relevance of social history and mental health at the sentencing phase of a capital case is clearly established by the United States Supreme Court, and

was clearly established both at the time of defendant's penalty phase in 1987 and at the time the California Supreme Court denied Zapien's ineffective assistance of counsel claims in 1998. *See California* v. *Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring); *Eddings* v. *Oklahoma*, 455 U.S. 104, 114–15 (1982); *Lockett* v. *Ohio*, 438 U.S. 586, 604–05 (1978) (plurality opinion); *Woodson* v. *North Carolina*, 428 U.S. 280, 303–05 (1976) (plurality opinion). However, the Supreme Court has clarified that *Strickland* does not require penalty phase counsel to "investigate every conceivable line of mitigating evidence." *Wiggins* v. *Smith*, 539 U.S. 510, 533 (2003).

Here, defense counsel sought out—and introduced—a considerable amount of mitigating evidence. For example, counsel called a cultural anthropologist who testified as an expert about the "physical, social, [and] economic isolation," in the La Colonia community in Oxnard. Counsel also introduced testimony from a medical doctor about the effects of heroin addiction, and solicited character testimony from Zapien's friends and family. Through this evidence, defense counsel introduced a picture of Zapien as a kind and affectionate child who was raised in an overcrowded, drug-infested and impoverished "slum" without parental supervision or a male role model. Counsel also appealed to the notion of lingering doubt by introducing information regarding the prosecution's possible misconduct, which called into question the reliability of the prosecution's evidence. "[C]ounsel's decision not to mount an all-out investigation into petitioner's background in search of mitigating circumstances was supported by reasonable professional judgment." *Burger* v. *Kemp*, 483 U.S. 776, 794 (1987); *cf. Porter* v. *McCollum*, 558 U.S. 30, 39–40 (2009) (per curiam) (finding deficient performance during the

penalty phase where "counsel did not even take the first step of interviewing witnesses or requesting records" and "thus failed to uncover and present any evidence of [petitioner's] mental health or mental impairment"); *Wiggins*, 539 U.S. at 533 (finding deficient performance during the penalty phase where "counsel's investigation of petitioner's background was limited to [two court-commissioned] records," and holding that "strategic choices made after less than complete investigation are reasonable only to the extent that reasonable professional judgments support the limitations on investigation" (internal quotation marks and citation omitted)).

Furthermore, as the district court correctly found, mitigating evidence of drug dependency and an abusive family history "can be a two-edged sword that [a jury] might find to show future dangerousness" or use to conclude that a defendant is "simply beyond rehabilitation." *Pinholster*, 563 U.S. at 201(internal quotation marks omitted) (quoting *Atkins* v. *Virginia*, 536 U.S. 304, 321 (2002)). Given that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," *Strickland*, 466 U.S. at 690, the California Supreme Court was not unreasonable in denying this claim.

Zapien also argues that trial counsel should have introduced evidence of Zapien's psychiatric and neurological problems. However, it is not clear that Zapien actually suffers from any such problems. All that was presented for state habeas review was evidence that Zapien's family members suffered from mental illness, and that he was exposed to various things—like drugs, pesticides and blows to the head—that *could* have led to him developing a brain injury. The closest thing to an actual diagnosis of a mental

disorder is a doctor's testimony during Zapien's federal evidentiary hearing that he may have suffered from PTSD. However, that evidence was never presented in Zapien's state petition, and we are not permitted to consider it here. *Pinholster*, 563 U.S. at 181–82, 186. And, even if it were before us, there is no indication that counsel knew or should have known that Zapien suffered from such a disorder. Failure to introduce evidence of PTSD, therefore, didn't amount to ineffective assistance of counsel.

Zapien next argues that counsel was ineffective for failing to properly prepare two experts at sentencing. Both experts gave generic testimony—one about the socioeconomic profile of Zapien's neighborhood and the other about the effects of heroin abuse—but neither expert met with Zapien or tailored his testimony to Zapien's particular circumstances. Zapien can point to no case holding that failure to have an expert meet with a defendant constitutes ineffective assistance. And, in any event, if defense counsel had presented experts who "personalized" their testimony to Zapien, reasonable jurists could debate whether such expert testimony would have opened the door to evidence (or more evidence) regarding Zapien's heroin addiction as well as whether Zapien suffered from anti-social personality disorder—topics that may not have inured to Zapien's benefit in the eyes of the jury.

Finally, Zapien argues that counsel was ineffective because he didn't adequately rebut the prosecution's use of Zapien's prior manslaughter conviction as an aggravating factor. According to Zapien, counsel failed to explain to the jury that the victim in that crime had attacked and raped Zapien's girlfriend a few days before the killing. Instead, trial counsel sought to obscure the particular facts of Zapien's

prior crime and emphasize the lower degree of culpability required for a manslaughter conviction.

In *Wong* v. *Belmontes*, 558 U.S. 15 (2009) (per curiam), the Supreme Court reversed this court's grant of habeas relief based on the purported prejudicial ineffective assistance of Belmontes's trial counsel and reinstated the petitioner's death sentence. Belmontes was convicted of murdering a woman during a burglary. *Id.* at 15. At sentencing, Belmontes's counsel presented nine witnesses who testified about Belmontes's difficult childhood. *Id.* at 19. Nevertheless, Belmontes argued that counsel should have offered more mitigating evidence. *Id.* at 16. However, Belmontes had a prior conviction for accessory after the fact to voluntary manslaughter. *Id.* at 17. There was substantial evidence that Belmontes had, in fact, committed murder but pleaded guilty to a lesser offense, and counsel built his mitigation strategy around the "overriding need" to exclude the details of Belmontes's criminal history. *Id.* at 18. The Supreme Court held that trial counsel had reasonably tailored his mitigation case to avoid opening the door to the aggravating evidence of Belmontes's manslaughter conviction, which would have become admissible had the unoffered evidence been received. *See id.* at 25–26. As the Supreme Court explained, "[a] heavyhanded case to portray Belmontes in a positive light . . . would have invited the strongest possible evidence in rebuttal—the evidence that Belmontes was responsible for not one but two murders." *Id.* at 25.

A fairminded jurist could conclude that counsel faced a similar dilemma regarding the details of Zapien's prior conviction. Zapien's jury knew that he had previously been convicted for stabbing a man to death with a machete. And, while Zapien pled to voluntary manslaughter, there was

evidence that the killing was actually premeditated—evidence that would likely have been revealed to the jury had counsel elaborated on the details of the attack. Accordingly, we must conclude that the California Supreme Court could have reasonably determined that Zapien failed to show that counsel's representation was constitutionally inadequate, or that he suffered prejudice from the lack of additional mitigating evidence.

### 5. Juror Prejudice

Zapien's final argument is that his right to an impartial jury was violated when the trial court failed to dismiss a juror who admitted to hearing a news report that suggested Zapien would hurt his guards if he were given the death penalty. The trial court held a hearing in which the judge questioned the juror, and eventually ruled that he was capable of being impartial. The California Supreme Court rejected Zapien's argument that the trial court erred in this credibility determination, and concluded that the juror's knowledge of the news report was harmless.

Zapien argues that the California Supreme Court's decision was an unreasonable application of *Mattox* v. *United States*, 146 U.S. 140 (1892), which established a rebuttable presumption of prejudice when a juror is exposed to information garnered outside of the trial. However, in substance, the California Supreme Court applied the *Mattox* presumption when it held that the trial court properly determined the juror could be impartial. Once again, our posture is doubly deferential: Zapien asks us to hold that the California Supreme Court was unreasonable in failing to find that the trial court made an unreasonable credibility determination about whether the juror was prejudiced.

Zapien has no non-speculative basis for that conclusion. Instead, he effectively advocates for a per se rule in which exposure to any out-of-trial information automatically requires juror dismissal.   Such an approach is plainly inconsistent with *Mattox* and its progeny.  As with Zapien's other claims, the California Supreme Court's decision was at least reasonable.

**AFFIRMED.**