**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LESTER ROBERT OCHOA,<br>*Petitioner-Appellant*,<br><br>v.<br><br>RONALD DAVIS, Warden,<br>*Respondent-Appellee.* | No. 16-99008<br><br>D.C. No.<br>2:99-cv-11129-DSF<br><br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted March 23, 2021
San Francisco, California

Filed November 1, 2021

Before: Johnnie B. Rawlinson, Richard R. Clifton, and
Daniel P. Collins, Circuit Judges.

Opinion by Judge Clifton

## SUMMARY[*]

### Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of Lester Ochoa's habeas corpus petition, under 28 U.S.C. § 2254, challenging the constitutionality of his conviction and death sentence imposed in California state court.

Ochoa was convicted in a single trial in 1988 for a series of violent crimes against three female victims over a six-month period the previous year, including murder, kidnapping, forcible rape, and assault with a deadly weapon.

This court previously granted Ochoa a certificate of appealability as to five claims, which the panel reviewed with the deference prescribed by the Antiterrorism and Effective Death Penalty Act of 1996.

Ochoa contended that his right to due process under the Fifth and Fourteenth amendments, as established by *Brady v. Maryland*, 373 U.S. 83 (1963), was violated when the prosecutor failed to disclose that three jailhouse informants had told state police officers that Edward Ramage had implicated himself in Lacy Chandler's murder. The panel held that the California Supreme Court's determination that the undisclosed evidence was not material at the guilt or penalty phase of the proceedings was not contrary to or an unreasonable application of *Brady*, nor did it amount to an

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

unreasonable determination of the facts in light of the circumstances.

Ochoa argued that his trial counsel rendered ineffective assistance under *Strickland v. Washington*, 466 U.S. 688 (1984), during the penalty phase by failing to dig further into the conditions in which Ochoa lived as a child and into his family's history of mental health issues and violence. The panel held that even if counsel's performance was deficient, which is far from clear, the California Supreme Court's determination that the alleged deficiency did not cause prejudice to Ochoa was not unreasonable.

Ochoa asserted that because trial counsel failed to present the additional mitigation evidence at issue in the ineffective-assistance claim, his death sentence violates the Eighth Amendment in that the jury's verdict was not based on consideration of all the available mitigating evidence and therefore was not a reliable finding of death. The panel wrote that because the California Supreme Court did not unreasonably decide that Ochoa's counsel was not ineffective under *Strickland*, it follows that his punishment is not a violation of his Eighth Amendment right based on trial counsel's performance and the mitigation evidence they failed to present. The panel noted that Ochoa provided no support for his legal theory that ineffective assistance can support a separate Eighth Amendment claim. In addition, the panel wrote that this claim is barred because the right asserted by Ochoa had not been recognized by the Supreme Court prior to the time his conviction became final.

Ochoa contended that his right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments was violated when, during the penalty phase of

the proceedings, the trial court (1) refused to instruct the jury that it could consider sympathy for Ochoa's family; (2) permitted the prosecutor to argue that family sympathy was not an appropriate factor; and (3) prohibited him arguing that family sympathy evidence was an appropriate mitigating factor. The California Supreme Court held that the trial court did not err because: (1) no clearly established federal law required the court to instruct the jury as to family sympathy; (2) neither the trial court's instructions nor the prosecutor's argument precluded the jury from considering family sympathy evidence as indirect evidence of Ochoa's character or the circumstances of the offenses charged; and (3) the court did not prohibit Ochoa from arguing that family sympathy was relevant. The panel held that the California Supreme Court's conclusion was not contrary to or an unreasonable application of clearly established law or an unreasonable determination of the facts in light of the circumstances.

Ochoa contended that his privilege against self-incrimination under the Fifth and Fourteenth Amendments, as set forth in *Simmons v. United States*, 390 U.S. 377 (1968), was violated when the trial court considered his suppression hearing testimony about the night Chandler was killed in deciding his post-conviction motion for a new trial. The panel held that the California Supreme Court's decision on the merits regarding Ochoa's suppression hearing testimony was not contrary to or an unreasonable application of *Simmons* or any other clearly established federal law. The panel explained that *Simmons*, which bars the admission of a defendant's suppression hearing testimony as evidence against the defendant at trial on the on the issue of guilt, does not dictate that suppression hearing statements cannot be considered in proceedings outside the guilt phase or for

purposes other than establishing substantive guilt at trial. The panel held that even if Ochoa had demonstrated a constitutional violation, the California Supreme Court's determination was reasonable. Noting as well that Ochoa seeks to expand *Simmons* and establish a new rule of constitutional jurisprudence on collateral review, the panel wrote that *Teague v. Lane*, 489 U.S. 288 (1989), precludes the application of Ochoa's proposed rule retroactively in his federal habeas proceedings.

The panel declined Ochoa's request to expand the certificate of appealability to include his claim that his right to due process, as set forth in *In re Winship*, 397 U.S. 358 (1970), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny, was violated because the penalty phase jury instructions failed to direct the jury that it was required to find, beyond a reasonable doubt, that aggravating circumstances existed and outweighed the mitigating circumstances.

## COUNSEL

James S. Bisnow (argued), Law Offices of James S. Bisnow, Pasadena, California; Joseph F. Walsh (argued), Los Angeles, California; for Petitioner-Appellant.

Stephanie C. Santoro (argued) and Dana Muhammad Ali, Deputy Attorneys General; Lance E. Winters, Senior Assistant Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Rob Bonta, Attorney General; Attorney General's Office, Los Angeles, California; for Respondent-Appellee.

**OPINION**

CLIFTON, Circuit Judge:

Petitioner Lester Ochoa appeals from the district court's denial of his habeas corpus petition, under 28 U.S.C. § 2254, challenging the constitutionality of his conviction and death sentence imposed in California state court. Ochoa was convicted in a single trial in 1988 for a series of violent crimes against three female victims over a six-month period the previous year, including murder, kidnapping, forcible rape, and assault with a deadly weapon. *See People v. Ochoa*, 966 P.2d 442, 458 (Cal. 1998).

Ochoa's conviction and death sentence were appealed to the California Supreme Court, which affirmed the judgment in its entirety. *Id*. Ochoa twice sought habeas relief from the California Supreme Court, but those petitions were denied. Ochoa commenced federal habeas proceedings in the United States District Court for the Central District of California. The district court denied and dismissed Ochoa's habeas corpus petition, declined to issue a certificate of appealability on any of the claims, and entered judgment. *See Ochoa v. Davis*, No. CV 99-11129, 2016 WL 3577593, at *1, *144 (C.D. Cal. June 30, 2016).

Ochoa requested a certificate of appealability from this court on seven of the claims presented in his habeas petition. His request was granted as to five of the claims: (1) a claim pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), asserting a due process violation resulting from the prosecutor's failure to disclose jailhouse informant statements that appeared to impeach a key witness against him by implicating that witness in the murder charged; (2) a claim pursuant to

*Strickland v. Washington*, 466 U.S. 688 (1984), asserting ineffective assistance of counsel at the penalty phase of his trial; (3) a claim asserting a violation of the Eighth Amendment due to arguments not made by Ochoa's trial counsel at the penalty phase; (4) a claim asserting a violation of the Eighth Amendment prohibition on cruel and unusual punishment resulting from the trial court's refusal to instruct the jury that it could consider sympathy for Ochoa's family as a mitigating factor at the penalty phase; and (5) a claim pursuant to *Simmons v. United States*, 390 U.S. 377 (1968), asserting a violation of the privilege against self-incrimination resulting from the trial court's consideration of Ochoa's suppression hearing testimony in deciding his post-conviction motion for a new trial. The parties briefed those certified issues. Ochoa also briefed a sixth, uncertified claim, asserting a due process violation resulting from the trial court's asserted failure to require that the jury find, beyond a reasonable doubt, that aggravating circumstances existed and that the aggravating circumstances outweighed the mitigating circumstances.

We affirm the district court's denial of Ochoa's habeas corpus petition. Ochoa has failed to establish that the California Supreme Court's decision was contrary to or constituted an unreasonable application of clearly established federal law or an unreasonable factual determination in light of the circumstances with respect to any of his claims. *See* 28 U.S.C. § 2254(d)(1), (2). We decline to expand the certificate of appealability to reach the uncertified claim because Ochoa has failed to demonstrate that the accuracy of the district court's resolution of that claim is reasonably debatable. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

## I.  Background

The following factual summary is drawn from the California Supreme Court's 1998 opinion. *See Ochoa*, 966 P.2d 442 (providing a more detailed discussion of the facts surrounding Ochoa's conviction and subsequent proceedings).

A police officer found the body of sixteen-year-old Lacy Chandler at a school in Baldwin Park, California, on June 18, 1987, at approximately 7:30 am. *See Ochoa*, 966 P.2d at 460–61. Chandler's body was found near an incinerator, bloody and with knife wounds. *Id*. at 461. Chandler was last seen by her boyfriend when she dropped him off for work at approximately 3:00 am that morning. *Id*. at 460–61. A forensic examination of Chandler's body revealed twenty-three stab wounds, averaging four inches in depth. *Id*. at 460. Marks on the ground at the crime scene indicated that Chandler's body had been dragged back and forth about ten feet before it was left near the incinerator. *Id*. at 461. An investigator took casts of shoe prints located about twenty feet from Chandler's body, of which there was only one clear type. *Id*.

Officers began to investigate Ochoa after hearing from Edward Ramage that, earlier that year, Ramage had interrupted Ochoa raping another woman, C.J., at the same school where Chandler's body had been found. *See id.* at 458–61, 465. Ochoa was charged and convicted of that crime in the same trial, as described below at 10–11. Ramage subsequently admitted that he had himself participated in the rape of C.J. 966 P.2d at 459.

Officers asked Ochoa if he would be willing to take a voluntary polygraph examination at the Baldwin Park Police Station. *Id*. at 465. Ochoa agreed. *Id*. During the polygraph examination, Ochoa confessed to killing Chandler and offered to produce the murder weapon. *Id*. at 466. Ochoa accompanied an officer to retrieve the knife that Ochoa said he used to kill Chandler. *Id*. Upon returning to the police station, Ochoa gave a taped confession in the presence of two officers. *Id*. at 461, 467.

In his taped confession, Ochoa said that on the night in question he had been high on cocaine. *Id.* at 462. Ochoa explained that he was walking down a street at approximately 3:00 am on June 18, 1987, when he saw a blonde girl, who turned out to be Chandler, near a car. *Id*. at 461. Ochoa said that he approached Chandler with a knife in hand and took her to the school where the two engaged in intercourse. *Id*. Ochoa said that he stabbed Chandler to death because he was afraid that she might report him. *Id*. at 462. Ochoa admitted to dragging Chandler's body to the incinerator. *Id*. Ochoa denied having raped other women in the past. *Id*. Ochoa said that he originally hid the murder weapon in his home, but later moved it to where it was ultimately recovered. *Id*.

Before trial, Ochoa moved to suppress his taped confession and exclude the knife recovered as a result of his confession. *Id.* at 464. After holding a hearing on Ochoa's motion and considering the relevant testimony, the trial court denied the suppression motion. *Id*. at 464, 469–70. The prosecutor introduced Ochoa's taped confession at trial. *Id*. at 461. Ochoa did not testify at trial. *Id*. at 463.

A criminalist compared plaster shoe print casts and photographs of the crime scene with the soles of Ochoa's

shoes and testified that one of his shoes had sole patterns and a size consistent with the crime scene evidence but noted that there was not enough detail to produce an exact match. *Id*. A serologist testified that the blood evidence was inconclusive as to whether any of the semen found on Chandler's pants or recovered from samples taken from Chandler's body belonged to Ochoa or as to whether blood found on the knife that Ochoa produced belonged to Chandler. *Id*. Toxicological results did not reveal any trace of cocaine or other commonly abused drugs in Chandler's blood. *Id*.

The prosecutor called Ramage to testify in its case in chief. *Id.* at 462. Ramage denied any involvement in Chandler's murder. *Id*. at 458, 462. Ramage admitted that he and Ochoa had raped C.J. in January of 1987, after consuming a quarter of a gram of cocaine together. *Id*. at 459. Ramage testified that Ochoa had wanted to kill C.J. but that Ramage had convinced Ochoa to let her go. *Id*. Ramage acknowledged that he had entered into a plea agreement regarding the crimes against C.J., received an eight-year prison sentence for his involvement, and agreed to testify in Ochoa's case. *Id*. at 462. Ochoa sought to impeach Ramage's credibility as a witness and suggest to the jury that Ramage killed Chandler. *Id*.

Ochoa was prosecuted in the same trial for his actions against C.J. The victim testified that Ochoa and Ramage kidnapped and raped her on January 28, 1987. *Id*. at 458–60. Although the assailants were unknown to her at the time of the rape, C.J. was later able to identify Ochoa and Ramage from two separate photograph six-packs. *Id*. at 459–60. C.J. explained that, as she was returning home just before midnight, Ochoa grabbed her from behind, forced her behind a garbage dumpster, and demanded money. *Id*. at 458. At that

point, Ramage arrived. *Id*. Ochoa and Ramage took C.J. to a nearby school where they blindfolded her and forced her to remove her clothes and to get down on her hands and knees. *Id*. The two men then raped C.J. over the course of three hours. *Id*. at 458–59. C.J. recalled that Ochoa appeared to be in charge, that Ramage shook when he touched her, and that Ramage asked Ochoa not to hurt her. *Id*.

Ochoa was also prosecuted in the trial for crimes against a third victim, Ochoa's sister-in-law, Y.A. She testified about an incident on May 23, 1987, where Ochoa entered her home without permission and lay in wait behind the front door. *Id*. at 460. When Y.A. entered her home Ochoa grabbed her, held a knife to her neck, forced her into a bedroom, and choked her until she became unconscious. *Id*. Ochoa's attack on Y.A. ended when Ochoa was interrupted by Y.A.'s cousin, whom Y.A. instructed to call the police. *Id*.

The jury found Ochoa guilty of committing crimes against all three victims. With respect to the crimes against sixteen-year-old Chandler, the jury convicted Ochoa of first-degree murder, forcible rape, and kidnapping. *Id*. at 458, 464. The jury found true two special circumstances in connection with Chandler's murder: that the murder occurred during the crime of kidnapping and that the murder occurred during the crime of rape. *Id*. at 458. Following a separate penalty phase trial, the same jury imposed a death sentence for the murder conviction, and the trial court refused to modify the death sentence. *Id*. In addition to the death sentence, the court also sentenced Ochoa to six years for the forcible rape conviction and five years for the kidnapping conviction, each term to run consecutively, but stayed both sentences.

As for the crimes against C.J., the jury found Ochoa guilty of "kidnapping for robbery, simple kidnapping, robbery, forcible rape, forcible rape in concert, forcible oral copulation, forcible oral copulation in concert, rape by means of a foreign object (namely fingers), attempted forcible sodomy, and attempted forcible sodomy in concert." *Id.* The trial court imposed a sentence of life with possibility of parole for the kidnapping for robbery conviction. The court sentenced Ochoa to five years for simple kidnapping, three years for robbery, six years for forcible rape, seven years for forcible rape acting in concert, six years for forcible oral copulation, seven years for forcible oral copulation acting in concert, six years for rape by a foreign object, three years for attempted forcible sodomy, and three and a half years for attempted forcible sodomy in concert. The court ordered the convictions for rape by a foreign object, attempted forcible sodomy, and attempted forcible sodomy in concert to run concurrently to any other conviction. The court ordered the remainder of the sentences to run consecutively but stayed those sentences.

Finally, as for the crimes against Y.A., the jury found Ochoa guilty of two counts of assault with a deadly weapon by means of force likely to cause great bodily injury, assault with intent to rape, and residential burglary. *Id*. The court sentenced Ochoa to three years and one year for the two counts of assault with a deadly weapon or by means of force likely to produce great bodily injury, four years for assault with intent to commit rape, and four years for the burglary with a additional one-year enhancement for use of a deadly weapon. The court ordered each of the sentences to run consecutively and to be stayed.

Following his conviction and the imposition of a death sentence, Ochoa filed a motion for a new trial based, in part, on newly discovered evidence, which he asserted the prosecutor failed to disclose in violation of Ochoa's due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963). After a hearing, the trial court denied Ochoa's motion for a new trial. *Ochoa*, 966 P.2d at 516.

Ochoa's conviction and death sentence were automatically appealed to the California Supreme Court. On direct appeal, the California Supreme Court affirmed Ochoa's judgment of conviction and death sentence. *See generally Ochoa*, 966 P.2d 442. The United States Supreme Court denied his petition for writ of certiorari. *See Ochoa v. California*, 528 U.S. 862 (1999). Following his direct appeal, Ochoa filed two state habeas corpus petitions in the California Supreme Court, one in 1997 and the other in 2002. *See In re Ochoa*, S064794, 1998 Cal. LEXIS 7406, at *1 (Nov. 5, 1998); *In re Ochoa*, S109935, 2003 Cal. LEXIS 2047, at *1 (Mar. 26, 2003). Both state habeas petitions were summarily denied.

Ochoa commenced habeas proceedings in the United States District Court for the Central District of California in 1999. Ochoa filed the operative pleading, the Third Amended Petition ("Petition"), on December 18, 2007. In 2016, the district court denied and dismissed the Petition, declined to issue a certificate of appealability, and entered judgment. Ochoa timely appealed and requested a certificate of appealability from this court. This court granted that request as to five of seven issues, as described above at 6–7.

We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253.

## II.  Standards of Review

We review de novo the district court's denial of Ochoa's Petition. *See Gulbrandson v. Ryan*, 738 F.3d 976, 986 (9th Cir. 2013).

As Ochoa filed his habeas petition after April 24, 1996, our review is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254. *See Lambert v. Blodgett*, 393 F.3d 943, 965 (9th Cir. 2004). AEDPA bars the relitigation of any claim adjudicated on the merits by a state court unless one of two narrow exceptions set forth in 28 U.S.C. § 2254(d)(1) or (2) applies. *Harrington v. Richter*, 562 U.S. 86, 98 (2011). We presume that the state court adjudicated each claim "on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id*. at 99. Relitigation is barred unless the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," at the time the state court adjudicated the claim, 28 U.S.C. § 2254(d)(1), or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id*. § 2254(d)(2). Accordingly, AEDPA confirms a federal court's "authority to issue [a] writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the United States Supreme] Court's precedents." *Richter*, 562 U.S. at 102; *see Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). The petitioner bears the burden of proof under AEDPA. *Richter*, 562 U.S. at 98. AEDPA demands a "highly deferential" review of state courts, giving those decisions the "benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (internal quotation marks and citation omitted).

"The 'contrary to' and 'unreasonable application' clauses of § 2254(d)(1) have independent meaning." *Cook v. Kernan*, 948 F.3d 952, 965 (9th Cir. 2020). A state court's decision is "contrary to" clearly established federal law if it fails to apply controlling authority, "applies a rule that contradicts the governing law," or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court" and reaches a different result. *Id.* (quoting *Williams*, 529 U.S. at 405–06). A decision is an "unreasonable application" of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts" of the case. *Id*. (quoting *Williams*, 529 U.S. at 407–08); *see Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) ("The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous.").

Under 28 U.S.C. § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Rather, a finding is unreasonable if an appellate court "could not reasonably conclude that the finding is supported by the record." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004), *abrogation on other grounds as recognized by Murray v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014).

"[D]etermining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning." *Richter*, 562 U.S. at 98. Even when a state court has issued a summary denial, the petitioner must show that there was no reasonable basis for the state court to deny relief. *See id*. Pursuant to § 2254(d), federal courts must consider what theories supported, or

could have supported, the state court's decision and ask whether the theories are inconsistent with Supreme Court precedent. *Id*. at 102. AEDPA does not require citation—or even awareness—of Supreme Court precedent "so long as neither the reasoning nor the result of the state-court decision contradicts" precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).

## III.    Discussion

Ochoa presents six constitutional claims, five certified and one uncertified. We first address the two claims discussed at oral argument—the *Brady* and *Strickland* claims—followed by the remaining certified claims, and, finally, the uncertified claim.

### A.  Brady *Due Process Claim*

Ochoa contends that his right to due process under the Fifth and Fourteenth Amendments, as established by *Brady v. Maryland*, 373 U.S. 83 (1963), was violated when the prosecutor failed to disclose that three jailhouse informants had told state police officers that Ramage had implicated himself in Chandler's murder. The California Supreme Court concluded that the informants' evidence "was not material either as to guilt or penalty," and thus, there had been no due process violation warranting a new trial. *Ochoa*, 966 P.2d at 516–18. The district court concluded that the California Supreme Court's denial of Ochoa's *Brady* claim "did not amount to an unreasonable application of clearly established federal law" or "an unreasonable determination of the facts in light of the evidence" because all of the evidence in the record pointed to Ochoa's guilt and because Ochoa's confession, knowledge of the location of the murder weapon,

and the forensic evidence contradicted the jailhouse informants' testimony. *Ochoa*, 2016 WL 3577593, at *30.

### 1. Legal Standard

State prosecutors have a duty under the Fourteenth Amendment Due Process Clause to disclose certain evidence to criminal defendants. *See Brady*, 373 U.S. at 87; *United States v. Bagley*, 473 U.S. 667, 674–77 (1985). In *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. A successful *Brady* claim requires a showing that the evidence was: (1) favorable to the accused; (2) suppressed by the prosecution; and (3) prejudicial. *See Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

"Any evidence that would tend to call the government's case into doubt is favorable for *Brady* purposes," *Milke v. Ryan*, 711 F.3d 998, 1012 (9th Cir. 2013), including exculpatory and impeachment evidence, *Comstock v. Humphries*, 786 F.3d 701, 708 (9th Cir. 2015) (citing *Strickler*, 527 U.S. at 281–82). Evidence may be deemed "suppressed" for the purpose of *Brady* even where the failure to disclose favorable evidence was unintentional, *see Benn v. Lambert*, 283 F.3d 1040, 1053 (9th Cir. 2002), or where the prosecutor was unaware that others, acting on the government's behalf, had such evidence, *see Kyles v. Whitley*, 514 U.S. 419, 437 (1995). "The terms 'material' and 'prejudicial' are used interchangeably in *Brady* cases." *Benn*, 283 F.3d at 1053 n.9. The prosecution's failure to disclose evidence is prejudicial "if there is a reasonable probability

that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682 (opinion of Blackmun, J.); *see Kyles*, 514 U.S. at 433–34. A "reasonable probability" of a different result exists when the failure to disclose "undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678 (majority opinion). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence [the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.

### 2.   Motion for a New Trial

As discussed above at 10, at Ochoa's trial, Ramage testified for the prosecution and admitted that he and Ochoa had raped C.J. at the same school where Chandler's body was later found. *Ochoa*, 966 P.2d at 458–59.

Following his conviction and sentencing, Ochoa filed a motion for a new trial asserting that the prosecutor failed to disclose statements from three jailhouse informants, Richard Slawinski, Willie Ray Battle, and Dennis Austin, about conversations in which Ramage implicated himself in Chandler's murder. *Id*. at 515–16. Ochoa argued that the undisclosed statements were relevant to impeach Ramage's testimony because Ramage testified that he was not involved in and had no direct knowledge of Chandler's murder. *Id*. At a hearing on the motion, the trial court heard testimony from the three jailhouse informants, several law-enforcement officers, Ochoa's defense investigator, and Ramage. *Id*. at 515–17.

Slawinski submitted a written statement and testified regarding what he alleged Ramage told him while the two were housed together in 1988. *Id.* at 515. Slawinski asserted that Ramage told him that he had been involved in the murder of a sixteen- or seventeen-year-old girl at a school with Ochoa. *Id*. Slawinski recalled that Ramage told him that Ramage, Ochoa, and the girl went to the school to get high on cocaine. *Id.* Slawinski said that Ramage told him that the girl attempted to escape after Ochoa voiced his intent to rape her but that Ramage pulled her off a fence and held her down while Ochoa stabbed her approximately twenty times. *Id.* Slawinski testified that he relayed Ramage's statements to Baldwin Park Police Department Sergeant Richard Valdemar. *Id*. On cross-examination, Slawinski conceded that, although he spoke to Ramage about forty to fifty times about the murder, he could not recall many additional details of the conversation. *Id*. Slawinski admitted to being a long-time informant and providing information to Sergeant Valdemar in approximately ten to twenty criminal cases. *Id*. Slawinski denied asking Sergeant Valdemar for any benefits in exchange for informing. *Id*. The prosecution impeached that denial with evidence that Slawinski gave information to the Pomona Police Department related to another case to avoid a prison sentence and to obtain a plea agreement. *Id*.

Stanley White, one of the detectives who handled the investigation of Chandler's murder, confirmed that Sergeant Valdemar called him to inform him of Slawinski's statements. *Id*. at 515–16. White testified that he discounted Slawinski's statements because he generally believed jailhouse informant statements to be "highly inaccurate" and because he was convinced, by both the physical evidence and Ochoa's confession, that there was no one else involved in Chandler's murder. *Id*.

Battle similarly submitted a written statement and testified that Ramage had confessed to participating in Chandler's murder. *Id*. at 516. Battle testified that Ramage stated that he and Ochoa had raped "a young girl, about 15" at the place of a prior rape and that Ochoa subsequently stabbed the girl to death. *Id*. Battle said that he did not inform law enforcement about Ramage's statements because he was scheduled to be released from jail the following month. Battle admitted to having served as an informant approximately one hundred times, giving statements in thirteen murder cases, and testifying in seven. *Id*. Battle conceded that he expected that he would receive a benefit "for giving truthful statements against Ramage." *Id*.

Austin testified that Ramage informed him that Ramage and Ochoa had "part[ied]" and "g[otten] high on coke" at a school with a sixteen- or seventeen-year-old girl with whom they intended to have sex. *Id*. Austin stated that Ramage told him that the girl panicked and tried to run but that Ramage grabbed her feet and Ochoa stabbed her. *Id*. Austin said that he called Baldwin Park police to report Ramage's confession and spoke to a police officer, telling the officer that he had information about "Lester Ochoa and Eddie Ramage being involved" in a crime involving a sixteen- or seventeen-year-old stabbing victim. Austin did not go into great detail with the officer because he was told that the case was already being handled. *Id*.

Ochoa's defense investigator, Gordon Zbinden, testified that, before trial, he told the prosecutor that he believed at least two people had been involved in Chandler's murder. *Id*. Zbinden based his opinion on his seventeen years of experience in law enforcement and the physical evidence. *Id.*

The prosecutor called Ramage to testify at the new trial hearing. *Id*. Ramage stated, as he had at the trial, that he had not been involved in any crimes against Chandler. *Id*. Ramage testified that he had shared a cell with Slawinski and that Battle was housed in an adjoining cell. *Id*. Ramage said that he sought Slawinski's and Battle's advice because they were long-time informants and knew how the "game work[ed]." Ramage testified that he told the informants about his participation in the assault on C.J., that he was testifying against Ochoa, and that he was not involved in Chandler's murder. *Id*. Ramage said that the information he gave the informants about Chandler's murder, including the number of times Chandler had been stabbed, came from a detective on the case. *Id*.

The trial court denied Ochoa's motion for a new trial, deciding that although the prosecution had an obligation to turn over the undisclosed evidence, its failure to do so did not constitute a denial of due process or undermine Ochoa's right to a fair trial. *Id.* at 516–17. The trial court noted that the jury was in fact presented with evidence undermining Ramage's credibility. *Id.* Moreover, the trial court reasoned that regardless of the effect the informants' statements might have had on Ramage's credibility, the informants' statements were undermined by the physical evidence. *Id*.

### 3.  California Supreme Court Decision

The California Supreme Court held on direct appeal that, although the prosecution should have disclosed Slawinski's and Austin's statements to Ochoa, the statements were not material under *Brady*, and accordingly, no due process violation had occurred. *Ochoa*, 966 P.2d at 517–18.

Discussing the materiality standard set forth in the United States Supreme Court decisions in *Bagley* and *Kyles*, the California Supreme Court concluded that the prosecutor's failure to disclose the informants' statements, although a discovery violation, was not a due process violation that undermined the fairness of Ochoa's trial. *Id.* The California Supreme Court determined that the evidence would not have raised "a significant question about Ramage's credibility." *Id.* at 518. The court reasoned that Ramage's credibility "would have been extraordinarily difficult to impeach" because Ramage volunteered information that he knew would implicate him in the crimes against C.J. at a time when he was not suspected of any wrongdoing. *Id.* Moreover, the California Supreme Court reasoned that the testimony of the jailhouse informants was not credible and would likely have been impeached at trial. *Id.* In addition, the California Supreme Court noted that although the jailhouse informants' testimony might have implicated Ramage in Chandler's murder, it also would have reinforced the evidence against Ochoa, such that it was unlikely that the evidence would even have been introduced as part of his defense. *Id.* at 517.

4.  Analysis

As an initial matter, Ochoa argues that we should not afford AEDPA deference to the California Supreme Court's review of his *Brady* claim because the decision was objectively unreasonable because it failed to address whether the undisclosed evidence was material at the *penalty* phase of the proceedings. In effect, Ochoa asks us to review his *Brady* claim de novo. That argument lacks merit. The California Supreme Court explicitly stated that the undisclosed evidence "was not material either as to guilt or *penalty*," and held that the prosecutor's failure to disclose the evidence "did not . . .

make the entire guilt or *penalty* phase fundamentally unfair, much less the trial as a whole." *Ochoa*, 966 P.2d at 517 (emphases added). A state court decision is not unreasonable merely because the decision did not include a detailed explanation of the court's reasoning. *Richter*, 562 U.S. at 98. Ochoa has the burden of demonstrating that there was no reasonable basis for the state court's determination. *Id*. Accordingly, we apply AEDPA deference to the California Supreme Court's denial of Ochoa's *Brady* claim.

The parties do not dispute that Slawinski's and Austin's statements regarding Ramage's alleged involvement in Chandler's murder were suppressed by the prosecution. As the trial court and California Supreme Court observed, the prosecution had an obligation under *Brady* to disclose to the defense the jailhouse informants' statements known to law enforcement.[1]

Ochoa contends that the undisclosed evidence was favorable and material at the penalty phase of his trial. Ochoa reasons that the jury might have imposed a life sentence rather than a death sentence if it heard the evidence of Ramage's involvement on the theory that a death sentence would have seemed to the jury extremely disproportionate to Ramage's eight-year sentence for a related crime and to no punishment for the rape and murder of Chandler.

---

[1] As Battle never informed law enforcement regarding his conversations with Ramage, his statements could not have been suppressed within the meaning of *Brady*, though his subsequent testimony was arguably relevant to bolster the evidence regarding the information passed to law enforcement by the other informants.

First, the California Supreme Court noted that each of the jailhouse informants testified that Ramage told them that Ochoa participated in Chandler's murder and described Ochoa as stabbing Chandler while Ramage held her feet. *Ochoa*, 966 P.2d at 516–17. The court reasoned that, given that the informants' statements reinforced the evidence against Ochoa, it is unlikely that Ochoa would have introduced the statements at trial had they been disclosed because they corroborated the most serious charge against him. *Id*. at 517. That determination was not unreasonable.

Although Ochoa may be correct that the jailhouse informants' statements were relevant to impeach Ramage's testimony by suggesting Ramage's involvement in Chandler's murder, the materiality determination is not a question of relevance, but prejudice. We must ask whether the prosecutor's failure to disclose the statements "undermines confidence in the outcome" of Ochoa's trial and sentence. *Bagley*, 473 U.S. at 678. For that reason, the question of materiality or prejudice "must be analyzed in the context of the entire record." *Benn*, 283 F.3d at 1053 (internal quotation marks and citation omitted). We must assess "the nature and strength of both the evidence the defense was prevented from presenting and the evidence each side presented at trial" to determine whether Ochoa was prejudiced. *Bailey v. Rae*, 339 F.3d 1107, 1119 (9th Cir. 2003) (internal quotation marks and citation omitted).

The California Supreme Court's conclusion that the informants' statements were not material was not contrary to or an unreasonable application of *Brady*. The California Supreme Court's determination, that it would have been difficult to impeach Ramage with the jailhouse informants' statements, was not unreasonable in light of the

circumstances. Ramage's credibility was heavily bolstered, as the California Supreme Court noted, by the fact that he knowingly subjected himself to criminal liability for the assault on C.J. when he chose to inform and testify regarding Ochoa's involvement in Chandler's murder. *Ochoa*, 966 P.2d at 518. On the other hand, the trial court found that the jailhouse informants lacked credibility. *Id.* The informants were themselves impeached based on their extensive history informing for the state in other cases and the admitted benefits they received or hoped to receive for testifying in Ochoa's case. In addition, as the district court noted, the jailhouse informants' statements were inconsistent with Ochoa's taped confession and the crime scene evidence. *See Ochoa*, 2016 WL 3577593, at *30. In his taped confession, Ochoa did not implicate Ramage or indicate that he had acted in concert with another individual in killing Chandler. *Ochoa*, 966 P.2d at 461–62. The crime scene had shoe prints made by only one type of shoe, a type consistent with Ochoa's, further indicating that Ochoa acted alone. *Id.* at 461, 463. As the trial court and California Supreme Court noted, despite statements by Slawinski and Austin that Ramage said Chandler had used cocaine shortly before her death, the autopsy revealed no trace of cocaine or other drugs in her blood. *Id.* at 463, 516–17. It was not unreasonable for the trial court and the California Supreme Court to conclude that the undisclosed jailhouse informants' statements were not credible and would have been of little persuasive value if introduced at trial.

Moreover, viewing the undisclosed statements in the context of the entire record, we note that the jury did hear other impeachment evidence regarding Ramage. The jury heard from Baldwin Park Police Detective Aquino that two civilians informed him that Ramage told the civilians that he had participated in Chandler's murder. *Id.* at 463. The jury

heard evidence that Ramage routinely carried a buck knife and used drugs. *Id*. at 463, 482. The jury heard that Ramage confessed to participating in the assault on C.J. *Id.* at 459. Similarly, the jury heard Ramage testify that he spoke to the police because he believed that others suspected him of being involved in Chandler's murder. *Id*. at 463. Finally, the jury heard evidence that Ramage had sexually assaulted a girl when she was eight or nine years old. *Id.* That evidence did not persuade the jury that Ochoa was not guilty or should receive a lesser punishment. It was not unreasonable for the California Supreme Court to conclude that the information that was withheld from Ochoa at the time would not have made a difference.

We agree with the district court that the California Supreme Court's determination that the undisclosed evidence was not material at the guilt or penalty phase of the proceedings was not contrary to or an unreasonable application of *Brady*, nor did it amount to an unreasonable determination of the facts in light of the circumstances. *See Ochoa*, 2016 WL 3577593, at \*30.

## B. *Ineffective Assistance of Counsel Claim*

Ochoa argues that his trial counsel was ineffective during the penalty phase. Specifically, Ochoa alleges that his attorneys and their investigators should have dug further into the conditions in which he lived as a child and into his family's history of mental health issues and violence. Ochoa argues that if counsel had asked more prying questions and investigated his father's criminal history, they would have seen red flags that would have alerted them to the horror that was Ochoa's childhood.

It is undisputed at this point that Ochoa's childhood, as elucidated by the habeas investigation and related witness declarations, was far from a happy, stable one. However, it is unclear what trial counsel knew of the true conditions of Ochoa's childhood. Perhaps more importantly, the California Supreme Court appears to have determined that Ochoa did not suffer prejudice from any shortcomings of his counsel's representation. We conclude that such a determination was not unreasonable. As a result, this claim fails.

### 1. Legal Standard

To prove a constitutional violation for ineffective assistance of counsel, Ochoa must show (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105. Under § 2254(d), Ochoa must demonstrate that "it was necessarily unreasonable for the California Supreme Court to conclude: (1) that he had not overcome the strong presumption of competence; and (2) that he had failed to undermine confidence in the jury's sentence of death." *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011). This review is therefore "doubly deferential" as we defer both to the trial counsel's tactical decisions and to the California Supreme Court's determination that the trial counsel was not ineffective under *Strickland*. *Id*.

### 2. Decisions Below

The California Supreme Court summarily denied this claim on the merits when it denied Ochoa's state habeas petitions without elaboration. The court did not specify

whether Ochoa's claim failed on the first *Strickland* prong, the second, or both. *In re Ochoa*, 1998 Cal. LEXIS 7406, at \*1; *In re Ochoa*, 2003 Cal. LEXIS 2047, at \*1.

The district court concluded that the California Supreme Court did not unreasonably apply *Strickland*. The district court noted an absence of evidence to suggest that counsel should have discovered evidence of Ochoa's bad childhood and dysfunctional family. *Ochoa*, 2016 WL 3577593, at \*69. Ultimately, the district court concluded that counsel's strategy to portray Ochoa as a redeemable, good person who only acted badly under the influence of drugs was reasonable. *Id.* at \*67–68. The court reasoned that the new evidence if presented could have impacted the jury negatively because the jury could have understood it to mean that his bad behavior was not the result of drug abuse but instead that he was a "fundamentally and perhaps organically flawed character" who was "irretrievably broken." *Id.* Thus, the district court concluded that Ochoa's counsel did not act unreasonably and he was not prejudiced by his counsel's actions. *Id.* at \*69.

    3.  Facts

During the penalty phase of Ochoa's trial, his counsel focused on his drug abuse. The district court aptly characterized the penalty phase presentation as putting on evidence of Ochoa being a "Jekyll and Hyde" of sorts—"a good young man who was made into a monster by substance abuse." *Id.* The defense called as witnesses members of Ochoa's family, a childhood friend, victim Y.A., law enforcement officers who had interacted with Ochoa, and an expert on cocaine's effect on the human body.

During the penalty phase of the trial, Ochoa's half-sister testified that Ochoa was a fun-loving child and had many friends. She also stated that Ochoa's parents treated him well and spoiled him. She testified that "conflict" was constant in their home, but clarified that Ochoa was treated "very well" by his parents and that "he had a pretty good childhood and a lot of love." When Ochoa was around fourteen or fifteen years old, his half-sister saw his personality start to change; he began using slang, and she assumed he was hanging around with the wrong crowd. His childhood friend testified that he and Ochoa started getting into trouble together when they were twelve years old because they belonged to a gang and were involved in activities including stealing, smoking, and committing robberies. This friend had seen Ochoa use several kinds of drugs, including PCP, cocaine, and heroin.

According to his family's testimony, Ochoa became plagued by drug abuse as a teenager and his drug abuse continued until his arrest in this case. His personality when he was high on drugs was very different than when he was sober. When Ochoa was high on drugs, he acted belligerently and people were afraid of him. His sister testified that when he was high, he had physically abused his wife at least ten times and fought with their father at least fifteen times.

The witnesses testified that Ochoa was not without the ability to feel remorse. When Ochoa would return home after getting high, he was often regretful and expressed the desire to get help. Officer White testified that when Ochoa confessed to the murder, he cried and asked for help "for what he had done." The witnesses also testified that Ochoa could still contribute to society even if sentenced to life imprisonment. A deputy sheriff testified that during the month and a half that Ochoa was under his supervision in jail,

Ochoa worked an eight-hour day performing clerical and manual tasks. The officer observed that Ochoa was not aggressive, was willing to work, and got along well with the other prisoners. A consultant for the California Department of Corrections opined that Ochoa would adjust well to prison and be a productive prisoner as there was less access to drugs in prison.

Habeas counsel argues that the picture painted of Ochoa's childhood at trial was false. Rather than the fun and loving childhood that was presented to the jury, habeas counsel describes Ochoa's childhood as "an extremely toxic and dysfunctional one" in "a macabre household consisting of an alcoholic and abusive father and a weak, passive and confused mother with a family history of mental illness and a home where, incest and violence occurred almost daily." Habeas counsel argue that the penalty phase defense that should have been presented was that Ochoa had mental impairments and grew up under horrible conditions, which led him to use drugs, and resulted in his crimes.

Habeas counsel collected declarations from Ochoa's family members, including his half-sister, his sister, his wife, and his mother, who each had testified at the trial, as well as childhood neighbors and friends, which substantiated that version of the story. These declarations depicted a troubled home life with physical and sexual violence, excessive drinking, and a lack of parenting and stability. Although most of the violence was directed at others, Ochoa witnessed much of it. Some violence was directed at Ochoa, but he was treated considerably better than his half-siblings. Most of the violence was by Ochoa's father, described in probation records from before Ochoa's birth as an "immature psychopath" with "little moral insight." The declarations also

discussed the family history of Ochoa's mother, including mental illness, drug addiction, and alcoholism.

Habeas counsel asserts that these declarations show that Ochoa "was a man born into a world in which he never had a chance." Habeas counsel argues that had the jury learned of Ochoa's true family history, it would have humanized him and would have explained why Ochoa began using drugs. As a result, according to habeas counsel, there was a reasonable probability that the jury would have spared his life.

Habeas counsel also had Ochoa reevaluated for mental illness. One of the evaluators, Richard Romanoff, Ph.D., a psychologist who examined Ochoa in 2001, criticized the evaluations conducted in 1988 as cursory. Both habeas reports found that Ochoa had cognitive impairments. Most notably, Dr. Kyle Boone, Ph.D., a neuropsychologist who examined Ochoa in 2002, concluded that Ochoa "appears, to some extent, to lack the basic 'brain equipment' with which to make reasoned choices regarding his behaviors."

   4.   Analysis

       a.   Prejudice

In assessing whether the California Supreme Court reasonably concluded that Ochoa was not prejudiced by counsel's alleged failure to investigate and present mitigating evidence, we must "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Pinholster*, 563 U.S. at 197–98 (quoting *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)). A defendant must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been

different." *Strickland*, 466 U.S. at 694. In a capital case, this means a defendant must show "a reasonable probability that at least one juror" would have voted for a life sentence. *Wiggins*, 539 U.S. at 537.

Knowing that the "Jekyll and Hyde" penalty phase presentation was unsuccessful, Ochoa now argues that the failure to present the alternative defense focused on a horrific family life supported with the additional mitigating evidence prevented the jury from having a full picture of his background. He alleges that providing the jury with facts about his violent upbringing and dysfunctional family would have humanized him and changed the weighing of the aggravating and mitigating factors such that the jury would not have recommended a death sentence.

That the penalty phase defense offered at trial was not successful is not sufficient to make an ineffective assistance of counsel argument. *See Strickland*, 466 U.S. at 689–90.

It was not unreasonable for the California Supreme Court to find that the new evidence and arguments presented by habeas counsel did not demonstrate trial counsel was ineffective. The new evidence of Ochoa's life history is of little or even negative mitigating value compared to the evidence presented at his trial. Ochoa's habeas counsel argue that if the evidence had been presented the jury would have learned about Ochoa's pervasive childhood exposure to violence and alcohol. According to habeas counsel, at least one juror would have concluded that Ochoa was a victim who was less culpable due to this disadvantaged background. *See Boyde v. California*, 494 U.S. 370, 382 (1990). But presenting evidence of his father's volatility and abusive behavior and his mother's family history of mental illness could have

diminished the mitigating impact of Ochoa's relationship with his family and his positive character and background attributes. *See Pinholster*, 563 U.S. at 201 ("The new evidence relating to [defendant's] family—their more serious substance abuse, mental illness, and criminal problems —is also by no means clearly mitigating, as the jury might have concluded that [defendant] was simply beyond rehabilitation." (citation omitted)); *Zapien v. Davis*, 849 F.3d 787, 798 (9th Cir. 2015) (recognizing that mitigating evidence of an abusive family "'can be a two-edged sword that a [jury] might find to show future dangerousness' or use to conclude that a defendant is 'simply beyond rehabilitation'" (quoting *Pinholster*, 563 U.S. at 201)). Ochoa would no longer have been portrayed as a nice guy when sober, but, rather, as a man who was fundamentally damaged. Under the deferential standard, we ask if the California Supreme Court's determination that trial counsel's strategy did not prejudice Ochoa was unreasonable. *Pinholster*, 563 U.S. at 190. It was not.

Habeas counsel also had two mental health evaluations of Ochoa conducted at San Quentin Prison. The new mental health evaluations were also not necessarily mitigating. It was not unreasonable for the California Supreme Court to conclude that trial counsel was not ineffective for failing to have such evaluations conducted or presenting such evidence during the penalty phase of the trial. First, the evaluations could have opened the door to the prosecution calling its own rebuttal experts who may have countered the evaluations. *See id.* at 201. Further, the jury may not have concluded that the evidence presented by the habeas experts was mitigating. Dr. Romanoff found Ochoa to be "an extremely fragile and in many ways distrustful individual who was extremely sensitive to any perceived rejection or disrespect," a person

with "significant antisocial traits" and one who was "extremely damaged." This evidence may have led the jury to conclude that Ochoa was irretrievably damaged and there was no reason to spare him. Dr. Boone similarly concluded that Ochoa "appears, to some extent, to lack the basic 'brain equipment' with which to make reasoned choices regarding his behaviors."

Moreover, the new mental health evaluations were equivocal and inconclusive. For example, Dr. Romanoff opined that Ochoa's test results "open[ed] up the possibility of underlying organic impairment in Mr. Ochoa that may well have been present in him since birth," impairments that may have been caused by his mother's drinking during her pregnancy with Ochoa. Dr. Romanoff stated that more testing would be required to "more fully explore th[ese] possibilit[ies]." A jury could have determined that the evaluations were of little value because they were inconclusive.

Further, the California Supreme Court could have reasonably concluded that the aggravating evidence outweighed any possible mitigating value of habeas counsel's proposed penalty phase presentation. The aggravating evidence included the underlying crimes of rape against C.J., the assault on Y.A., and the rape and murder of sixteen-year-old Chandler, who was stabbed twenty-three times. It also included evidence of two prior crimes of violence by Ochoa, an attack on a woman in 1983 where Ochoa pushed her into a car and repeatedly hit her in the head, and a 1986 conviction for battery in which Ochoa grabbed a man outside of a doughnut shop and then resisted arrest. *Ochoa*, 966 P.2d at 494. The mitigating evidence presented at the penalty phase included humanizing

portrayals of Ochoa by his family and the hope that he could be productive in prison without the presence of drugs. *See id.* at 494–97. The new evidence regarding Ochoa's dysfunctional upbringing and mental health evaluations could reasonably be concluded to not be so strong as to outweigh the overwhelming aggravating evidence.[2] There is far more than just a "reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105. There is not nearly enough to justify holding, under § 2254(d)'s extremely deferential standard, that the denial of relief by the California Supreme Court was unreasonable.

Ochoa relies on *Porter v. McCollum*, 558 U.S. 30 (2009), *James v. Ryan*, 679 F.3d 780 (9th Cir. 2012), *vacated and remanded on other grounds*, 568 U.S. 1224 (2013), and *White v. Ryan*, 895 F.3d 641 (9th Cir. 2018), to support his claim. In all three cases, the appellate court's review of the prejudice determination was de novo, without AEDPA deference. *Porter*, 558 U.S. at 39; *James*, 679 F.3d at 803–04; *White*, 895 F.3d at 671. Thus, they "offer no guidance with respect to whether a state court has *unreasonably* determined that prejudice is lacking." *Pinholster*, 563 U.S. at 202; *see Richter*, 562 U.S. at 101 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." (citation omitted)).

---

[2] That the jury deliberated for only approximately five hours suggests that additional mitigating evidence of dubious strength would not have made a difference. *Cf. United States v. Velarde-Gomez*, 269 F.3d 1023, 1036 (9th Cir. 2001) (en banc) ("Longer jury deliberations weigh against a finding of harmless error [because l]engthy deliberations suggest a difficult case." (internal quotation marks and citation omitted)).

Even if the performance of trial counsel was deficient, which, as we discuss briefly below, is far from clear, the California Supreme Court's determination that the alleged deficiency did not cause prejudice to Ochoa was not unreasonable. *Pinholster*, 563 U.S. at 200–02; *see also id.* at 197–98; *Richter*, 562 U.S. at 101–03, 111–13; *Woodford*, 537 U.S. at 26–27 (concluding the California Supreme Court's decision was not objectively unreasonable when it determined the circumstances of the crime and prior offenses outweighed the potential mitigating evidence of a "troubled family background").

### b.  Deficiency

Trial counsel's performance was deficient if, considering all the circumstances, it "fell below an objective standard of reasonableness . . . under prevailing professional norms." *Strickland*, 466 U.S. at 688. A federal court will only overturn a state court's determination if that determination was unreasonable. *See Richter*, 562 U.S. at 105. Counsel's strategic choices are "virtually unchallengeable" and generally should not be evaluated in hindsight. *See Strickland*, 466 U.S. at 689–90. Instead, courts should "focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [petitioner's] background *was itself reasonable*." *Wiggins*, 539 U.S. at 523 (citing *Strickland*, 466 U.S. at 691).

We agree with the district court that the California Supreme Court was not unreasonable in determining that the mitigation case presented by trial counsel was not unreasonable, even in light of the new information. *Ochoa*, 2016 WL 3577593, at *67–69. We further agree that it was not unreasonable for the California Supreme Court to

conclude that trial counsel conducted an adequate investigation[3] and that no red flags existed to cue trial counsel to conduct a further investigation. *Id.* at *69.

The California Supreme Court's determination that the *Strickland* claim was meritless was not unreasonable. *Richter*, 562 U.S. at 105. The California Supreme Court's denial of this claim was not an unreasonable application of clearly established law or an unreasonable determination of the facts in light of the evidence presented.

## C. *Eighth Amendment Claim Based on Failures of Trial Counsel*

Ochoa asserts that his death sentence is unconstitutionally unreliable because his trial counsel failed to present the additional mitigation evidence outlined in the ineffective assistance of counsel claim above. In doing so, he essentially presents his ineffective assistance of counsel argument under a different constitutional label. He argues that the sentence is legally infirm and violates his Eighth Amendment right because the jury's verdict was not based on consideration of all the available mitigating evidence and that was not, therefore, "a reliable finding of death." The California Supreme Court summarily denied this claim on the merits without explanation. *In re Ochoa*, 1998 Cal. LEXIS 7406, at

---

[3] Ochoa's trial counsel completed the type and depth of investigation our case law requires. *See Summerlin v. Schriro*, 427 F.3d 623, 630–31 (9th Cir. 2005) (en banc) (discussing a 1982 trial). As shown by the penalty phase case, his trial counsel investigated Ochoa's history of drug abuse, looked at his prior criminal history, inquired with family and neighbors about his upbringing, and examined his mental health reports. This investigation did not reveal the degree of the family dysfunction Ochoa now alleges.

*1; *In re Ochoa*, 2003 Cal. LEXIS 2047, at *1. The district court concluded that the claim was also barred as the right alleged had not previously been recognized by the Supreme Court. *Ochoa*, 2016 WL 3577593, at *72–73.

As we determined that the California Supreme Court did not unreasonably decide that Ochoa's counsel was not ineffective under *Strickland*, this claim fails. Ochoa was not prejudiced such that his federal constitutional right to counsel was violated. It follows that his punishment is not a violation of his Eighth Amendment right based on his trial counsel's performance and the mitigation evidence they presented or failed to present.

Ochoa does not provide support for his legal theory that ineffective assistance of counsel can support a separate Eighth Amendment claim. No Supreme Court case has been identified that invalidated a death sentence on Eighth Amendment grounds on the basis that counsel was ineffective for failing to present additional mitigation evidence. The seven Supreme Court cases cited by Ochoa do not support such a rule. *See Deck v. Missouri*, 544 U.S. 622, 632–33 (2005) (routine use of visible shackles during the capital penalty phase is prohibited); *Thompson v. Oklahoma*, 487 U.S. 815, 838 (1988) (imposition of the death penalty on juvenile offenders under sixteen is unconstitutional); *Johnson v. Mississippi*, 486 U.S. 578, 584–87 (1988) (death sentence based in part on an impermissible or irrelevant factor is unconstitutional); *Spaziano v. Florida*, 468 U.S. 447, 457–65 (1984) (judge may overrule a jury's recommendation of life in prison), *overruled by Hurst v. Florida*, 577 U.S. 92 (2016); *Lockett v. Ohio*, 438 U.S. 586, 604–05 (1978) (a state cannot preclude a sentencer from considering any aspect of the defendant's character or the circumstances of the offense);

*Gardner v. Florida*, 430 U.S. 349, 358–62 (1977) (Stevens, J., plurality opinion) (use of information which a capital defendant has no opportunity to deny or explain is prohibited in penalty proceedings); *Woodson v. North Carolina*, 428 U.S. 280, 303–05 (1976) (Stewart, J., plurality opinion) (individualized consideration of the offender and the circumstances of each case is required in capital sentencing). Although those cases do indicate a general principle that the determination that the death sentence is appropriate must be reliably made, none of them supports the argument made here by Ochoa. *See Saffle v. Parks*, 494 U.S. 484, 491 (1990) ("Even were we to agree with [petitioner's] assertion that our decisions . . . inform, or even control or govern, the analysis of his claim, it does not follow that they compel the rule that [petitioner] seeks.").

In addition, this claim is barred because the right asserted by Ochoa had not been recognized by the Supreme Court prior to the time his conviction became final. In *Teague v. Lane*, the Supreme Court explained that new rules of criminal procedure generally do not apply retroactively to cases where the conviction had already become final on direct review at the time the new rule was decided. 489 U.S. 288, 316 (1989).[4] "A new rule is defined as a rule that . . . was not *dictated* by precedent existing at the time the defendant's conviction became final." *Whorton v. Bockting*, 549 U.S. 406, 416

---

[4] The *Teague* and AEDPA inquiries are distinct. "The retroactivity rules that govern federal habeas review on the merits—which include *Teague*—are quite separate from the relitigation bar imposed by AEDPA; neither abrogates or qualifies the other." *Greene v. Fisher*, 565 U.S. 34, 39 (2011). However, there is some overlap. It is commonly accepted that "[a]n 'old rule' under *Teague* generally constitutes clearly established law for purposes of AEDPA." *Ponce v. Felker*, 606 F.3d 596, 604 (9th Cir. 2010).

(2007) (quoting *Saffle*, 494 U.S. at 488) (internal quotation marks omitted); *see Jones v. Davis*, 806 F.3d 538, 550–51 (9th Cir. 2015) (cautioning courts from defining a rule for purposes of a *Teague* inquiry at too high a level of generality and recognizing that if no case has applied appellant's "rule," it "strongly suggest[s] that the rule is novel"). "[A] holding is not so dictated . . . unless it would have been apparent to all reasonable jurists." *Chaidez v. United States*, 568 U.S. 342, 347 (2013) (internal quotation marks and citation omitted). Attempts to introduce new rules of criminal procedure on collateral review are typically "*Teague* barred," meaning they fail. There is one limited exception: "the rule is substantive."[5] *Bockting*, 549 U.S. at 416; *see Edwards v. Vannoy*, 141 S. Ct. 1547, 1560 (2021) (eliminating the watershed rule exception). To be a substantive rule, it must "place an entire category of primary conduct beyond the reach of the criminal law" or "prohibit imposition of a certain type of punishment for a class of defendants because of their status or offense." *See Sawyer*, 497 U.S. at 241. As the rule Ochoa claims was not established before his direct appeal became final, it is barred by *Teague* unless it falls into the exception. As it is not a substantive rule, this claim is barred by *Teague*.

---

[5] "The scope of the *Teague* exception[] must be consistent with the recognition that '[a]pplication of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system.'" *Sawyer v. Smith*, 497 U.S. 227, 242 (1990) (quoting *Teague*, 489 U.S. at 309).

Ochoa fails to demonstrate that the California Supreme Court's conclusion was contrary to, or an unreasonable application of, clearly established Supreme Court precedent because there was no such precedent. *See* 28 U.S.C. § 2254(d)(1).

## D. Eighth Amendment Family Sympathy Evidence Claim

Ochoa contends that his right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments was violated when, during the penalty phase of the proceedings, the trial court: (1) refused to instruct the jury that it could consider sympathy for Ochoa's family; (2) permitted the prosecutor to argue that family sympathy was not an appropriate mitigating factor; and (3) prohibited him from arguing that family sympathy evidence was an appropriate mitigating factor. The California Supreme Court held that the trial court did not err because: (1) no clearly established federal law required the court to instruct the jury as to family sympathy; (2) neither the trial court's instructions nor the prosecutor's argument precluded the jury from considering family sympathy evidence as indirect evidence of Ochoa's character or the circumstances of the offenses charged; and (3) the court did not prohibit Ochoa from arguing that family sympathy was relevant. *Ochoa*, 966 P.2d at 504–06. The district court expressed agreement with the California Supreme Court's reasoning. *Ochoa*, 2016 WL 3577593, at *78. We also agree.

### 1. Legal Standard

The Eighth Amendment's prohibition on cruel and unusual punishment requires that the sentencer be permitted to consider the "character and record of the individual

offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson*, 428 U.S. at 304. "[T]he sentencer . . . [must] not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604; *see Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982) (recognizing that the sentencer may not be precluded from considering "any relevant mitigating evidence"). Any such limitation on relevant mitigating evidence "creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty" and is unconstitutional. *Lockett*, 438 U.S. at 605.

2.  Jury Instruction and Argument Regarding Family Sympathy

At the penalty phase, Ochoa offered a proposed jury instruction related to the consideration of sympathy as a mitigating factor: "You may take sympathy for the defendant and his family into account in deciding whether to extend mercy to the defendant." *See Ochoa*, 966 P.2d at 504. The prosecutor objected. In ruling on the objection, the trial court stated that it was not aware of any authority providing that a jury should consider family sympathy, but the court also noted that it was unaware of authority prohibiting the jury from considering family sympathy. *Id*. The trial court concluded that "the law [wa]s that the defendant should be punished based upon his individual record, his individual background and his individual involvement." *Id*. at 505. Accordingly, the trial court struck the words "and his family" from Ochoa's proposed instruction. *See id*. at 504. The court gave a revised instruction: "You may take sympathy for the

defendant into consideration in determining whether or not to extend mercy to the defendant." *Id.*

In its closing argument at the penalty phase, the prosecutor discussed the meaning of the sympathy instruction:

> First of all, with regard to sympathy for the defendant, if there be any, if you feel that it is appropriate, one of the things that I want to point out to you and you can consider is that sympathy for the defendant means exactly that. It does not mean sympathy for his family.[6] It does not mean sympathy for the victim or the victim's family. Now, it's obvious that we have seen some of the defendant's family members come in here and testify, and they are very touched. They are very emotional. They are very hurt, and that is understandable. But your decision is not based on whether they feel bad about what happened any more than your decision can take into account the loss to the victim's family, because that is not what your job is. Your job is to decide what you've heard here and what the defendant has done and what his

---

**6** At the time of Ochoa's trial and penalty phase, *Booth v. Maryland*, 482 U.S. 496 (1987), in which the Supreme Court held that "the introduction of a [victim impact statement] at the sentencing phase of a capital murder trial violates the Eighth Amendment," *id.* at 509, was still good law. The prosecutor's statement with respect to considering sympathy for the victim, therefore, was proper at the time. The Supreme Court subsequently overruled *Booth* in *Payne v. Tennessee*, 501 U.S. 808, 830 (1991).

background is and whether he deserves that consideration.

Ochoa did not object to the argument.

### 3. California Supreme Court Decision

On direct appeal, the California Supreme Court rejected Ochoa's arguments that the jury was unconstitutionally precluded from considering family sympathy evidence as a mitigating factor in the penalty phase. *Ochoa*, 966 P.2d at 504–06. The California Supreme Court noted that there was no federal or state law requiring that the trial court instruct jurors that they may consider family sympathy evidence as a mitigating factor. *Id*. at 505.[7] The court recognized that, under federal law, a sentencer could not be precluded "from considering and giving effect to evidence relevant to the defendant's background or character or to the circumstances of the offense that mitigate against imposing the death penalty." *Id*. at 506 (quoting *Penry v. Lynaugh*, 492 U.S. 302, 318 (1989)). The court acknowledged that testimony from a defendant's family members could be relevant mitigating evidence, if the testimony "illuminate[d] some positive quality of the defendant's background or character." *Id*.

The California Supreme Court also considered whether the jury was precluded from considering any evidence of Ochoa's character or the circumstances of his offense, including relevant indirect evidence offered through the

---

[7] The California Supreme Court held, as a matter of first impression, that "sympathy for a defendant's family is not a matter that a capital jury can consider in mitigation." *Ochoa*, 966 P.2d at 506.

testimony of Ochoa's family. First, the court noted that the jury heard evidence of the emotional impact of a possible death sentence on Ochoa's family. *Id*. at 505–06. Further, the court examined the other instructions the trial court gave regarding what constituted a "mitigating factor," noting that those instructions "did not forbid him to argue to the jurors to take sympathy for his family into account." *Id*. at 504. Specifically, the court observed that the trial court instructed the jury that it could consider "unlimited" mitigating factors and explained that the "[m]itigating factors provided in the instructions [were] merely examples of some of the factors" the jury could consider in deciding whether a death sentence was warranted. *Id*. The California Supreme Court concluded that there was no federal constitutional violation because neither the jury instructions nor the prosecutor's argument prevented the jury from considering evidence relevant to Ochoa's character or the circumstances of the offense charged. *Id*. at 506.

### 4. Analysis

#### a. Jury Instructions

Ochoa argues that the Eighth Amendment demands that jurors be permitted to consider sympathy for a defendant's family as a mitigating factor at the penalty phase of a capital proceeding and asserts that the trial court's instructions and the prosecutor's argument precluded the jury from considering that evidence.

As the California Supreme Court observed, there was no clearly established federal law that required the trial court to instruct the jury that it could consider sympathy for Ochoa's family as a mitigating factor at the penalty phase. *See Ochoa*,

966 P.2d at 505. Although Ochoa relies on *Lockett*, he has failed to show how *Lockett* supports his claim. *Lockett* dictates that sentencers cannot be prohibited from considering any aspect of the defendant's character or the circumstances of the offense. 438 U.S. at 604. Ochoa has not demonstrated that the jury was so prohibited.

The record demonstrates that the jury heard evidence regarding the impact of the trial on Ochoa's family and was given several other instructions that made clear that the jury could consider any evidence in mitigation. Specifically, the jurors were instructed by the trial court that they were "free to assign whatever moral or sympathetic value [they deemed] appropriate to each and all of the various factors" and was told that mitigating factors were unlimited and not restricted to the examples provided in the instructions. *Ochoa*, 966 P.2d at 504–05. The trial court further instructed the jury to consider "[a]ny other circumstance . . . and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death." *Id.* at 505. The jury was also instructed that it could consider sympathy for the defendant when determining whether to extend him mercy. *Id*. The jury was not instructed to exclude from its consideration sympathy for Ochoa's family. Viewing the instructions collectively, there is no reasonable likelihood that the jury would have believed it could not consider Ochoa's family's testimony or sympathy for Ochoa's family as indirect evidence of Ochoa's character or the circumstances of the offense. The California Supreme Court's determination that the court's instructions—or lack thereof—did not preclude the jury from considering any evidence of Ochoa's character or the circumstances of the offense, was not unreasonable.

b. The Arguments Regarding Family Sympathy

Ochoa argues that his Eighth Amendment and Fourteenth Amendment rights were further violated when the trial court permitted the prosecutor to argue that the jury could not consider sympathy for Ochoa's family while prohibiting him from arguing the contrary.

There was no clearly established federal law that prohibited the prosecutor from arguing that the jury instruction term "sympathy for the defendant" was limited and did not mean sympathy for others. Nothing prohibited the prosecutor from attempting to guide the jury on how to consider the mitigating evidence it believed was relevant and decisive. Ochoa did not object to the prosecutor's argument regarding family sympathy at trial. *Ochoa*, 2016 WL 3577593, at *101–03.

Furthermore, the prosecutor's argument did not preclude the jury from considering family sympathy evidence. The prosecutor reminded the jurors that their decision was to be guided by the jury instructions, which in turn allowed for consideration of unlimited mitigating factors, and the jury is presumed to have followed the trial court's instructions. *See Zafiro v. United States*, 506 U.S. 534, 540 (1993); *see also Boyde*, 494 U.S. at 384 ("[A]rguments of counsel generally carry less weight with a jury than do instructions from the court."). Nothing in the record supports Ochoa's contention that the trial court prohibited defense counsel from arguing that family sympathy evidence was relevant mitigating evidence.

Ochoa has not demonstrated that the California Supreme Court's determination that Ochoa failed to demonstrate a

constitutional violation under the Eighth and Fourteenth Amendments was contrary to or constituted an unreasonable application of clearly established law or amounted to an unreasonable determination of the facts in light of the circumstances.

## E.  Simmons *Claim*

Ochoa contends that his privilege against self-incrimination under the Fifth and Fourteenth Amendments, as set forth in *Simmons v. United States*, 390 U.S. 377 (1968), was violated when the trial court considered his suppression hearing testimony about the night Chandler was killed in deciding his post-conviction motion for a new trial.

Before trial commenced, Ochoa testified at a hearing on a motion to suppress his taped confession and the physical evidence obtained as a result. The trial court denied that motion. *Ochoa*, 966 P.2d at 464, 469–70. Following his conviction and the imposition of a death sentence, Ochoa moved for a new trial arguing that the prosecutor violated his right to due process under *Brady* by failing to disclose statements from jailhouse informants, as discussed above at 18–21. The trial court denied Ochoa's motion for a new trial, relying, in part, on Ochoa's suppression hearing testimony.

The California Supreme Court concluded that the trial court did not err in considering Ochoa's suppression hearing testimony in deciding the motion for a new trial and that, even if it did err, the error was harmless beyond a reasonable doubt. *Ochoa*, 966 P.2d at 518–19. The district court concluded that the California Supreme Court's denial of Ochoa's claim on the merits did not amount to an

unreasonable application of clearly established federal law because there was no clearly established federal law holding that suppression hearing testimony cannot be considered by a trial court in deciding a motion for a new trial. *Ochoa*, 2016 WL 3577593, at \*30. The district court also concluded that Ochoa's claim was barred under *Teague* because Ochoa sought to establish a new rule of constitutional jurisprudence. *Id.* (citing *Teague*, 489 U.S. at 299–301). We agree with the district court.

### 1.  Legal Standard

In *Simmons*, the Supreme Court held that "when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection," regardless of whether the suppression motion is ultimately successful. *See* 390 U.S. at 394. In reaching this conclusion, the Court rejected the premise that the use of suppression hearing testimony cannot be a violation of the Fifth Amendment's prohibition on compelled testimony because it is "voluntary." *Id.* at 393–94. Although the Court recognized that "testimony is not always involuntary as a matter of law simply because it is given to obtain a benefit," it explained that the voluntariness of testimony is called into question when "the 'benefit' to be gained is that afforded by another provision of the Bill of Rights." *Id*. at 394. The Court concluded that it is constitutionally intolerable to force a defendant to surrender his Fifth Amendment privilege against self-incrimination to vindicate his Fourth Amendment right to exclude unlawfully obtained evidence. *Id*.

### 2. Suppression Hearing and Denial of Motion for a New Trial

During a voluntary polygraph examination, Ochoa confessed to killing Chandler. Ochoa later offered to take officers to recover the knife used in Chandler's murder and gave officers a taped confession. Before Ochoa's trial commenced, Ochoa moved to suppress his taped confession and exclude evidence relating to the knife that police found as a result of the confession. *Ochoa*, 966 P.2d at 464.

The trial court held a suppression hearing to consider Ochoa's motion. *Id*. At the hearing, Ochoa argued that his confession was involuntary, that he was not apprised of his *Miranda*[8] rights to counsel and to remain silent prior to the voluntary polygraph examination, that he did not understand his right to counsel after the *Miranda* admonition, and that his confession was offered in exchange for "false promises of lenity." *Id*. at 464–65. On cross-examination, Ochoa testified that he did not know if he killed Chandler. *Id*. at 468. On redirect, Ochoa explained that when he testified that he did not know if he killed Chandler, he meant that he did not kill her. *Id*.

Ochoa then gave testimony regarding his version of events the night Chandler was killed. *Id*. at 468–69. Ochoa stated that he saw Chandler walk toward the school with a man and followed them because he needed to get something back from the man. *Id*. at 468. Ochoa testified that he was intoxicated on beer and cocaine. *Id*. Ochoa stated that, at the school, he saw the man "swinging in an upward motion." *Id*. He said that when he approached the man, the man handed

---

[8] *Miranda v. Arizona*, 384 U.S. 436 (1966).

him a knife and asked for help. *Id*. Ochoa testified that he helped drag and hide Chandler's body. *Id*. Ochoa asserted that when he confessed to stabbing Chandler, he had no memory of actually doing so. *Id*. at 469. On recross-examination Ochoa said that he took the knife from the man because he did not know at that time that anyone had been killed. *Id*. at 469.

The trial court denied Ochoa's suppression motion on all grounds. *Id*. at 469–70. The trial proceeded and the prosecutor introduced Ochoa's taped confession in its case-in-chief. *Id*. at 461.

After the jury returned its verdict and imposed a death sentence, Ochoa filed a motion for a new trial, arguing that he was denied due process of law under *Brady* when the prosecutor failed to disclose the statements of jailhouse informants implicating Ramage in Chandler's murder. The trial court denied Ochoa's *Brady* motion for a new trial, concluding that the state's failure to disclose the informants' statements did not constitute a denial of due process or result in an unfair trial. *Id.* at 516–17. The trial court found that the informants' statements regarding Ramage's confession were not credible because all of the record evidence indicated that Ochoa acted alone. *Id.* The court compared the jailhouse informants' statements to the story Ochoa told at his suppression hearing that another man killed Chandler. The trial court concluded that, like the informants' testimony, Ochoa's suppression hearing story was "inherently not credible" because it was entirely inconsistent with the physical evidence and his taped confession, which, by contrast, was consistent with the physical evidence. In sum, the trial court determined that the prosecutor's failure to disclose the jailhouse informants' statements did not

prejudice Ochoa because the allegations that someone else was involved in Chandler's murder were simply not credible given the overwhelming evidence that Ochoa was guilty and acted alone.

### 3. California Supreme Court Decision

The California Supreme Court concluded that the trial court did not err in considering Ochoa's suppression hearing testimony. *Ochoa*, 966 P.2d at 518–19. As he later did in his habeas petition, on his direct appeal to the California Supreme Court Ochoa argued that the trial court's consideration of his suppression hearing testimony was problematic because it was elicited on cross-examination over his objection. *Id*. The California Supreme Court determined that, contrary to Ochoa's contentions, the testimony in question was offered by Ochoa on redirect. *Id*. at 518. Accordingly, the court reasoned that the prosecutor did not violate Ochoa's right against self-incrimination and that the trial court did nothing more than what Ochoa asked, to consider "all the papers and records on file" in deciding Ochoa's motion for a new trial. *Id*. In the alternative, the court concluded that any error was harmless beyond a reasonable doubt because the trial court would have denied Ochoa's motion for a new trial even if it had not considered Ochoa's suppression hearing testimony. *Id*. at 518–19.

### 4. Analysis

At the outset, Ochoa asserts that because the California Supreme Court did not cite *Simmons*, it failed to address his constitutional claim on the merits and thus, de novo review, rather than AEDPA deference, is appropriate. This argument lacks merit. The Supreme Court has repeatedly explained that

state courts are not required to cite—or even be aware of—Supreme Court precedent so long as the state court decision is not contrary to that precedent. *See Early*, 537 U.S. at 8; *Bell v. Cone*, 543 U.S. 447, 455 (2005) ("Federal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation."). We presume that the state court adjudicated Ochoa's claim on the merits. *See Richter*, 562 U.S. at 99. Ochoa has not rebutted, and cannot rebut, this presumption. The California Supreme Court directly considered and adjudicated the merits of Ochoa's constitutional claim regarding his suppression hearing testimony, as demonstrated by its conclusion that there was no violation of the right against self-incrimination and that even if there was an error, it was harmless beyond a reasonable doubt. *See Ochoa*, 966 P.2d at 518–19. Thus, we proceed to review the California Supreme Court's merits decision, applying AEDPA deference.

We agree with the district court's determination that the California Supreme Court's decision on the merits regarding Ochoa's suppression hearing testimony was not contrary to or an unreasonable application of *Simmons* or any other clearly established federal law. *Ochoa*, 2016 WL 3577593, at *31. *Simmons* does not control here. *Simmons* bars the admission of a defendant's suppression hearing testimony as evidence against the defendant at trial on the issue of guilt. 390 U.S. at 394. *Simmons* does not dictate that suppression hearing statements cannot be considered in proceedings outside the guilt phase or for purposes other than establishing substantive guilt at trial. The Supreme Court has explicitly left open "the proper breadth of the *Simmons* privilege," acknowledging that it has "not decided whether *Simmons* precludes the use of a defendant's testimony at a suppression hearing to impeach his

testimony at trial." *United States v. Salvucci*, 448 U.S. 83, 93–94 & n.8 (1980).

As there is no clearly established federal law that prohibited the trial court from considering Ochoa's testimony in deciding his post-conviction motion for a new trial, the California Supreme Court's decision cannot be deemed an objectively unreasonable application of clearly established federal law. *See Ponce*, 606 F.3d at 604 (citing *Wright v. Van Patten*, 522 U.S. 120, 126 (2008) (per curiam)); *see Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.").

Even if Ochoa had demonstrated a constitutional violation, he has failed to show that the California Supreme Court's harmlessness determination was unreasonable. *See Davis v. Ayala*, 576 U.S. 257, 269–70 (2015) ("When a *Chapman*[9] [harmlessness] decision is reviewed under AEDPA, a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable." (internal quotation marks and citation omitted)). The California Supreme Court reasonably concluded that the trial court had other valid reasons for denying Ochoa's motion for a new trial. *See supra* pp. 17–26.[10]

---

[9] *Chapman v. California*, 386 U.S. 18 (1967).

[10] Moreover, the trial court's consideration of Ochoa's suppression hearing statements was arguably generous to him. Effectively, what the trial court did was to consider whether the improperly withheld statements

Finally, we also agree with the district court that Ochoa's *Simmons* claim is *Teague* barred. *See Ochoa*, 2016 WL 3577593, at \*30. In arguing that *Simmons* precluded the trial court's consideration of his suppression hearing testimony in deciding his post-conviction motion, Ochoa seeks to expand *Simmons* and establish a new rule of constitutional jurisprudence on collateral review. *Teague* precludes the application of Ochoa's proposed rule retroactively in his federal habeas proceedings. *See* 489 U.S. at 299–301.

## F.  Uncertified Claim: Penalty Phase Burden of Proof Due Process Claim

Ochoa seeks to expand the certificate of appealability by raising an uncertified issue in his Opening Brief.  *See* 9th Cir. R. 22-1(e). Specifically, Ochoa argues that his right to due process, as set forth in *In re Winship*, 397 U.S. 358 (1970), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny, was violated because the penalty phase jury instructions failed to direct the jury that it was required to find, beyond a reasonable doubt, that aggravating circumstances existed and outweighed the mitigating circumstances. The state was not required to address Ochoa's uncertified claim in its answering brief and did not do so.

---

could have been deemed material for *Brady* purposes based on the alternative factual scenario presented in Ochoa's suppression hearing statements. It is difficult to see how Ochoa was prejudiced by the trial court's decision to expansively consider, and reject, this alternative theory of *Brady* prejudice. Ochoa's argument that *Simmons* precluded such consideration amounts to a contention that the trial court should have omitted that portion of its *Brady* analysis, which would still leave it wholly adverse to Ochoa.

Under AEDPA, certificates of appealability are governed by 28 U.S.C. § 2253(c). To obtain a certificate of appealability, a petitioner "must make a substantial showing of the denial of a constitutional right," which includes "showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack*, 529 U.S. at 484 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983), *superseded by statute on other grounds*). The district court considered and declined to issue a certificate of appealability as to any of Ochoa's claims. *Ochoa*, 2016 WL 3577593, at *144. Ochoa subsequently moved this court for a certificate of appealability on seven claims. Although we granted Ochoa's motion as to five of those claims, we specifically declined to certify this claim, concluding that the accuracy of the district court's resolution of this claim was not reasonably debatable. Having reviewed the Opening Brief's argument as to this uncertified claim, we reach the same conclusion. *See McKinney v. Arizona*, 140 S. Ct 702, 707–08 (2020). Accordingly, we decline to expand the certificate of appealability.

## IV.    Conclusion

We affirm the district court's denial of the Petition. We also decline to expand the certificate of appealability as to Ochoa's uncertified claim.

**AFFIRMED.**